[No. S048811. June 30, 1997.]

NIDA ENGALLA et al., Plaintiffs and Respondents, v.
PERMANENTE MEDICAL GROUP, INC., et al., Defendants and
Appellants.

PERMANENTE MEDICAL GROUP, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
NIDA ENGALLA et al., Real Parties in Interest.

WILLIS F. McCOMAS et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
NIDA ENGALLA et al., Real Parties in Interest.

## COUNSEL

Marion's Inn, Kennedy P. Richardson, Mark Palley, Archer, McComas & Lageson, Archer, McComas, Breslin, McMahon & Chritton and Willis F. McComas, in pro. per., and for Defendants and Appellants and for Petitioners.

Paul N. Halvonik, Fred J. Hiestand, Jackson, Tufts, Cole & Black, Gerald Z. Marer, Kenneth J. Philpot, Thelen, Marin, Johnson & Bridges, Curtis A. Cole, Michele Logan-Stern, Hammond, Zuetel & Cahill, Kenneth R. Zuetel, Jr., and Victoria K. Torigian as Amici Curiae on behalf of Defendants and Appellants and Petitioners.

No appearance for Respondent Superior Court.

David S. Rand, Carroll, Burdick & McDonough, Donald T. Ramsey and Rosemary Springer for Plaintiffs and Respondents and for Real Parties in Interest.

David E. Feller, Robert C. Post, Gail K. Hillebrand, Stefan M. Rosenzweig, David Link, Amy Bach, Anderson, Kill, Olick & Oshinsky, Eugene R. Anderson, Bennett Ellenbogen, Deborah M. Mongan, The Sturdevant Law Firm, James C. Sturdevant, Ann Saponara, McGuinn, Hillsman & Palefsky, Cliff Palefsky and Keith Ehrman as Amici Curiae on behalf of Plaintiffs and Respondents and Real Parties in Interest.

## OPINION

**MOSK, J.**—In this case we consider the circumstances under which a court may deny a petition to compel arbitration because of the petitioner's fraud in inducing the arbitration agreement or waiver of the arbitration agreement. Plaintiffs are family members and representatives of the estate of Wilfredo Engalla (hereafter sometimes the Engallas). Engalla was enrolled, through his place of employment, in a health plan operated by the Permanente Medical Group, Inc., Kaiser Foundation Hospitals, and the Kaiser Foundation Health Plan (hereafter Kaiser).

Prior to his death, Engalla was engaged in a medical malpractice dispute with Kaiser, which, according to the terms of Kaiser's "Group Medical and Hospital Services Agreement" (Service Agreement), was submitted to arbitration. After attempting unsuccessfully to conclude the arbitration prior to Engalla's death, the Engallas filed a malpractice action against Kaiser in superior court, and Kaiser filed a petition to compel arbitration pursuant to Code of Civil Procedure section 1281.2.[1] In opposing the petition, plaintiffs claimed that Kaiser's self-administered arbitration system was corrupt or biased in a number of respects, that Kaiser fraudulently misrepresented the expeditiousness of its arbitration system, and that Kaiser engaged in a course of dilatory conduct in order to postpone Engalla's arbitration hearing until after his death, all of which should be grounds for refusing to enforce the arbitration agreement. The trial court found in the Engallas' favor, denying Kaiser's petition to compel arbitration on grounds of fraud, but the Court of Appeal reversed.

We conclude that there is indeed evidence to support the trial court's initial findings that Kaiser engaged in fraudulent conduct justifying a denial of its petition to compel arbitration, but we further conclude that questions of fact remain to be resolved by the trial court before it can be determined whether Kaiser's conduct was actually fraudulent. Similarly, there is a factual question as to whether Kaiser's actions constituted a waiver of its right to compel arbitration. We accordingly reverse the judgment of the Court of Appeal and direct it to remand the case to the trial court for such factual determinations. As will appear, although we affirm the basic policy in favor of enforcement of arbitration agreements, the governing statutes place limits on the extent to which a party that has committed misfeasance in the performance of such an agreement may compel its enforcement.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

## I. Factual and Procedural Background

Because the nature of this case cannot be appreciated without a detailed understanding of its factual context, these facts are set forth at length below.[2]

Engalla immigrated to the United States in 1980, where he commenced employment with Oliver Tire & Rubber Company (hereafter Oliver Tire) as a certified public accountant. At that time, Engalla was invited to enroll himself and his immediate family in a health plan offered by Kaiser. Oliver Tire had offered its employees health care through Kaiser since 1976, and its plan was renewed annually thereafter. Engalla enrolled with Kaiser by signing an application form which stated, in relevant part: "I apply for health plan membership for the persons listed and agree that we shall abide by the provisions of the Service Agreement and health plan regulations. If the agreement so provides, any monetary claim asserted by a Member or the Member's heirs or personnel [sic] representative on account of bodily injury, mental disturbance or death must be submitted to binding arbitration instead of a court trial."

### A. The Underlying Medical Malpractice Claim.

In March 1986, Engalla presented himself to Kaiser's Hayward facility complaining of a continuing cough and shortness of breath. Tests were administered, including radiologic examinations, and Kaiser's radiologist noted abnormalities of his right lung. Previous radiologic studies performed by Kaiser in 1982 at the same Hayward facility had been inadvertently destroyed, but would otherwise have confirmed that the abnormal condition had only recently developed. In his notes from the 1986 examination, the radiologist recommended follow-up if the films could not be located, but none was ever performed. For several years thereafter, Engalla repeatedly presented Kaiser with complaints symptomatic of respiratory disease. On some occasions he was given an appointment with a physician, but on other occasions he was only permitted to see nurse practitioners. For years, he was given inhalation medication, but Kaiser failed to perform diagnostic tests that might have revealed the developing cancer. Instead, he was repeatedly diagnosed with common colds and allergies. X-rays taken in 1991 finally revealed adenocarcinoma of the lung, a type of lung cancer, but by then Engalla's condition was inoperable.

### B. The Arbitration Clause.

On or about May 31, 1991, Engalla and members of his immediate family served on Kaiser a written demand for arbitration of their claims that Kaiser

---

[2]Part I of this opinion has been adapted from the Court of Appeal opinion, with some modifications.

health care professionals had been negligent in failing to diagnose Engalla's lung cancer sooner. The Engallas' attorney, David Rand, correctly believed his clients were required to do so pursuant to the Service Agreement which was in effect at the time. The arbitration clause contained in the Service Agreement described the process for initiating a claim, the requirement that three arbitrators be used, and the time frame within which the arbitrators were to be selected. In this regard, section 8.B. of the Service Agreement provides that each side "shall" designate a party arbitrator within 30 days of service of the claim and that the 2 party arbitrators "shall" designate a third, neutral arbitrator within 30 days thereafter.[3] Section 8.C. sets forth general provisions concerning the arbitration of claims and incorporates applicable California law, including the California statute of limitations, the California Code of Civil Procedure provisions relating to arbitration, and the California Medical Injury Compensation Reform Act of 1975 (MICRA).

The Service Agreement further provides a broad statement governing its interpretation and, in that regard, states that Kaiser "is a named fiduciary to review claims under the Service Agreement." The nature of the claims for which Kaiser promises to act as a fiduciary is not specified, but a review of the Service Agreement reveals that the term "claims" appears in section 8, entitled "Arbitration of Claims."

The arbitration program is designed, written, mandated and administered by Kaiser. In regard to the latter, Kaiser collects funds from claimants and holds and disburses them as necessary to pay the neutral arbitrator and expenses approved by him or her. It monitors administrative matters pertinent to the progress of each case including, for example, the identity and dates of appointment of arbitrators. It does not, however, employ or contract with any independent person or entity to provide such administrative services, or any oversight or evaluation of the arbitration program or its performance. Rather, administrative functions are performed by outside counsel retained to defend Kaiser in an adversarial capacity.

The fact that Kaiser has designed and administers its arbitration program from an adversarial perspective is not disclosed to Kaiser members or

---

[3]The relevant portions of the Kaiser arbitration provision, found in section 8.B. of the Service Agreement, are as follows: "Within 30 days after initial service on a Respondent, Claimant and Respondent each shall designate an arbitrator and give written notice of such designation to the other, and Claimant shall forward $150, made payable to Kaiser Foundation Health Plan Arbitration Account, to Kaiser Foundation Health Plan. . . . This $150 will be deposited with Respondent's $150 in a special account maintained by Bank of America National Trust and Savings Association [and will] . . . provide the initial funds to pay the fees of the neutral arbitrator and expenses of arbitration as approved by him or her . . . . Within 30 days after these notices have been given and payments made, the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection to Claimant and all Respondents served, and the three arbitrators shall hold a hearing within a reasonable time thereafter . . . ."

subscribers. It is not set forth in the arbitration provision itself, or in any of Kaiser's publications or disclosures about the arbitration program, and it was unknown to Engalla's employer, who signed the Service Agreement on his behalf. The employer's representative, Theodomeir Roy, read the provisions of the Service Agreement, and believed that the arbitration process would be equally fair to both the employee-subscriber and to Kaiser, and that it would allow employees to resolve disputes quickly and without undue expense. His expectation in that regard was consistent with the intent of Kaiser's general counsel, Scott Fleming, who originally drafted the arbitration provision, as well as various publications disseminated to Kaiser members. In those materials, Kaiser represented that an arbitration in its program would reach a hearing within several months' time, and that its members would find the arbitration process to be a fair approach to protecting their rights.

### C. *Processing of the Engallas' Claim.*

Kaiser received the Engallas' May 31, 1991, demand for arbitration on June 5 or 6, approximately three business days after it was mailed by the Engallas' counsel. In that demand letter, Rand explained the nature of the claim, advised Kaiser of Engalla's terminal condition, and appealed to Kaiser to expedite the adjudication of the claim. Although he did not yet have a copy of the arbitration provision, Rand expressed an unqualified willingness to submit the matter to arbitration. At the same time, Rand indicated that he needed and was requesting a copy of the arbitration provision.

After hearing nothing for two weeks, Rand again wrote to Kaiser, repeated his agreement to arbitrate, and stressed the fact that "Mr. Engalla has very little time left in his life and I again urge you to assist me in expediting this matter for that reason." Several days later, Kaiser's in-house counsel, Cynthia Shiffrin, whose responsibility it was to monitor the Engallas' file, responded to the claim by acknowledging receipt and providing a copy of the arbitration provision per Rand's request. In turn, she requested $150, as required by the arbitration provision, as a deposit for half the expenses of the arbitration. Rand mailed the check the same day he received Shiffrin's letter. Shiffrin also expressed her willingness to comply with the request to avoid delay, noting that she had arranged for "expedited copies" of Engalla's medical records, and promising that outside counsel would contact Rand "in the near future with Kaiser's designation of an arbitrator."

### D. *Appointment of the Party Arbitrators.*

In his May 31, 1991, demand letter, Rand requested that Kaiser's counsel contact him at the earliest convenience "so we may choose arbitrators." He

repeated that request on June 14, 1991. On June 21, Kaiser's outside counsel, Willis F. McComas, indicated that Kaiser would provide the identity of its arbitrator only after receiving the Engallas' designation. Rand objected to this staggered disclosure as not authorized by the arbitration agreement. Having heard nothing from McComas by July 8, Rand went ahead and designated Attorney Peter Molligan as the Engallas' arbitrator, again repeating his request that Kaiser do likewise "so that the two arbitrators can immediately commence efforts to identify and appoint the neutral arbitrator." It was not until July 17, 47 days after service of the claim, that McComas designated Kaiser's party arbitrator, Attorney Michael Ney. McComas admitted that he had not calendered any of the deadlines for designation of the arbitrators, claiming "[t]here is no rule that requires that."

Although he had designated Ney as his party arbitrator, McComas had not actually contacted Ney beforehand to see if he was available. Instead, on the day he designated him, McComas wrote to Ney asking if he was available. In that letter, McComas advised Ney that the plaintiff was terminally ill, and that Rand had asked for an early arbitration date, but said that he had not responded to the request.

Although McComas was aware from the outset that Engalla was terminally ill and probably had only a few months to live, and claimed that he had "cooperated in the appointment of the party arbitrator very early in the case," it was later revealed that he had been advised by Ney in July that Ney was unable to accept any further assignments to act as a party arbitrator until late November, over four months away. When the fact of Ney's unavailability came to light on August 15, Rand made repeated requests that Kaiser appoint another arbitrator, but McComas refused. Rand also requested that Kaiser stipulate to a single neutral arbitrator, but that request was similarly refused. However, in late July, McComas did make arrangements for a backup arbitrator, Tom Watrous, who would step in if Ney was not available when the parties were ready to proceed with the arbitration hearing.[4]

E. *Negotiations for Appointment of Neutral Arbitrator and Hearing Date.*

According to the Service Agreement, a neutral arbitrator is to be chosen by the two party arbitrators within thirty days of their selection, and the hearing is to be held "within a reasonable time thereafter." Thus, pursuant to

---

[4]Watrous was, however, planning a three-week European vacation during October, which would have made him unavailable for much of the time period in which the Engallas were seeking to complete the arbitration.

the time frame mandated by Kaiser, the neutral arbitrator must be selected within 60 days after initial service of the claim. There is no dispute that timely appointment of a neutral arbitrator is critical to the progress of the case, inter alia, because the Code of Civil Procedure provides a right to discovery only "[a]fter the appointment of the arbitrator or arbitrators." (§ 1283.05, subd. (a).) In fact, in this case, McComas asserted that discovery could not commence until the neutral arbitrator was selected, because the neutral arbitrator would have to approve any discovery. Similarly, a hearing date cannot be set until the neutral arbitrator is appointed. (§ 1282.2, subd. (a).) In this case, McComas refused to discuss disclosure of expert witnesses until the hearing date was set. In short, the timely appointment of a neutral arbitrator is the linchpin of all progress in a Kaiser arbitration. Without a neutral arbitrator in place, and absent a stipulation, nothing can be accomplished.

Although the arbitration provision specifies that the two party arbitrators "shall" select a neutral arbitrator, in reality the selection is made by defense counsel after consultation with the Kaiser medical-legal department. Kaiser has never relinquished control over this selection decision. Indeed, in this case, McComas instructed Ney on who should be proposed and who was unacceptable. Thus, the timeliness of appointment of a neutral arbitrator depends upon cooperation and agreement by Kaiser and its counsel, as well as that of the claimants and their attorneys.

In the initial claim of May 31, 1991, Rand requested the immediate commencement of the process for selection of arbitrators. During the next few months, Rand wrote more than a dozen letters to the arbitrators and McComas asking that the selections be made. Only two weeks after serving his demand letter, Rand stated that he intended "to encourage both designated arbitrators to identify the third arbitrator at the earliest possible date." On July 8, Rand suggested an agreement on the date for designation of experts, preferably in August, "and that we anticipate having the arbitration soon thereafter." On July 18, Rand again wrote to McComas on the subject of scheduling the arbitration hearing, noting that he would be prepared to proceed by early September. On July 23, Rand wrote to both party arbitrators and McComas, again stressing the terminal condition of the plaintiff, his desire to hold the arbitration hearing in early September, and the urgent need to select the third, neutral arbitrator. Rand again wrote to the two party arbitrators on August 9, and again urged them to "select the third arbitrator as soon as possible." The Engallas' designated arbitrator, Peter Molligan, also attempted to push the defense into motion. On August 12, after trying at least three times to get Ney on the phone, Molligan finally wrote Ney about selecting the neutral arbitrator in order to "get this case moving." A few days

later, having still heard nothing, Rand tried again, saying: "Time is of the absolute essence and I again ask that you use all possible means to quickly select the third arbitrator. I am becoming increasingly concerned about the delays and am beginning to wonder whether the arbitration proceedings are suitable for this case."

During the week following August 15, 1991, the two party arbitrators exchanged six names. Rand also continued to press the issue of the unavailability of party arbitrator Ney, which he had just learned about, and repeated his request that the parties move toward a schedule that would allow the arbitration proceedings to begin in September. On August 30, having still heard nothing about the third arbitrator, Rand wrote to Judicial Arbitration and Mediation Services (JAMS) Judge Daniel Weinstein requesting proposals for judges who could be available for a hearing date "within the next several weeks."

On September 3, Ney wrote to Molligan, rejecting as unacceptable Judge Francis Mayer, one of the "neutrals" Molligan had suggested. Apparently, this veto was exercised pursuant to McComas's instructions. Ney expressed doubts about the availability of Molligan's other two choices—retired Judge Fannin or Weinstein, although he had not checked with either judge—and pressed instead for one of his own choices. On September 5, while Molligan was out of town, Rand agreed to one of the suggestions, Judge Robert Cooney, on the condition that "he can be available to commence this matter this month." If he was not available, Rand suggested two JAMS judges he knew to be available in September. Rand wrote to McComas again on September 18 and 25, literally begging for responses to his many suggestions for expediting the arbitration process.

Despite this additional prompting, McComas did not respond for almost three weeks and, when he finally wrote to Rand on September 24, he expressed uncertainty as to whether Judge Cooney had been agreed upon. Rand immediately responded on September 26 that Judge Cooney had been accepted and that he was only waiting for confirmation that the judge would be available "in the very near future." Apparently, because Kaiser holds itself out as the program administrator, collects and disburses arbitrator fees and had, in fact, proposed Judge Cooney, Rand assumed Kaiser would handle the formal retention of Judge Cooney and pay a deposit on his fees. Kaiser takes the position that it is the claimant's burden to move the case along, including making arrangements with the neutral arbitrator.

After almost two more weeks, McComas wrote again on October 7, this time claiming that "[t]o this date, neither you nor your clients have agreed to

the appointment of a neutral arbitrator" because "[y]ou apparently agreed to Judge Cooney with an unrealistic condition."[5] Rand responded on October 16, stating, "I am incredulous that you are *still* asking that we agree to the appointment of the neutral arbitrator. We have repeatedly informed you that we will agree to your suggestion of Judge Cooney. Why do you continue to insist that we have not agreed? My only reservation was and still is a question concerning availability." On October 18, Rand again wrote that he was "still waiting to hear from you concerning the final retention of Judge Cooney. I had promised him that he would be hearing from you when I advised him that we had agreed to his appointment."

Finally, on October 22, McComas wrote to say that he understood the Engallas had agreed to retain Judge Cooney as the neutral arbitrator, conditioned upon his availability, and that he had, therefore, instructed Ney to complete the retainer. By this time, 144 days—almost 3 months more than the 60 days for the selection of the arbitrators represented in the Service Agreement—had elapsed since the initial service of the claim. Engalla died the next day.

F. *Historical Data re Speed of Kaiser Arbitrations.*

Statistically, delays occur in 99 percent of all Kaiser medical malpractice arbitrations. An independent statistical analysis of Kaiser-provided data of arbitration between 1984 and 1986 reveals that in only 1 percent of all Kaiser cases is a neutral arbitrator appointed within the 60-day period provided by the arbitration provision. Only 3 percent of cases see a neutral arbitrator appointed within 180 days. On average, it has taken 674 days for the appointment of a neutral arbitrator. For claimants whose cases were resolved by settlement or after a hearing, the time required to appoint a neutral arbitrator consumed more than half the total time for resolution. Furthermore, because the arbitration provision of the Service Agreement does not clearly establish a time frame for a hearing (it must be within a "reasonable time" after appointment of the neutral arbitrator), and because Kaiser claims it has no obligation to participate in a hearing until it deems itself ready, there tend to be significant additional delays after appointment of the neutral arbitrator. Thus, on average, it takes 863 days—almost 2½ years—to reach a hearing in a Kaiser arbitration. The depositions of Scott

---

[5]The Engallas claim that McComas dissembled on September 24 and October 7 when he expressed uncertainty about Judge Cooney's availability and the plaintiffs' agreement to appointment of the retired judge. They argue that, by that time, McComas had not even contacted Judge Cooney to determine his availability, and that, in fact, Judge Cooney *was* available during September and October to preside over the hearing. They conclude that, by initially feigning uncertainty about whether Engalla had agreed to Judge Cooney's appointment, McComas managed to delay the appointment for over six weeks.

Fleming and Arthur Bernstein, both of whom formerly served as Kaiser's in-house counsel, revealed that Kaiser had long been aware that widespread delays were commonplace in Kaiser arbitrations.

### G. *Deposition Scheduling During the Aborted Arbitration Proceedings.*

In proceedings parallel to his efforts to complete appointments of the arbitrators, Rand began attempts to conduct discovery immediately after filing his demand for arbitration. On June 14, 1991, he wrote to Kaiser stating his desire to complete Engalla's deposition "on the earliest date permitted by law," and his willingness to schedule it for a mutually convenient time. McComas promptly responded to that request by noticing the depositions of all the Engallas for November 18, 1991—a date more than five months down the road—despite Rand's admonition that Engalla "had very little time left in his life." On June 26, Rand notified McComas that his proposed dates were unacceptable, and suggested that Engalla's deposition be taken "much earlier than you have noticed [because his] developing condition may not permit a full deposition on November 18." Rand again indicated his willingness to find mutually agreeable dates. He also requested the depositions of involved doctors "in the near future."

When McComas did not respond for almost two weeks, Rand noticed Engalla's deposition for August 9. In a letter accompanying that notice, Rand repeated his request for deposition of the doctors "this month" (July), proposed an agreement to designate experts in August, and offered to set dates for the other Engalla claimants at McComas's "earliest convenience." After the location was changed for medical reasons, Rand proceeded with Engalla's deposition on August 9, over Kaiser's objection that it had not been given any prior opportunity to conduct a discovery deposition. The August 9 deposition of Engalla, noticed and taken by Rand, was to be the only deposition that would be accomplished in the arbitration phase of this case.

Rand's efforts to schedule depositions of the involved doctors and nurses continued to founder. He initially requested dates for the depositions of the treating physicians on June 26, and did so again on July 8. In his June 26 request, and in each subsequent request, Rand offered to schedule the depositions at times—even after hours or on weekends—that would be convenient for Kaiser. He finally set them by notice of July 18. On July 24, McComas's secretary called Rand to request that they be taken off calendar. Rand responded that he would cooperate, but only if alternative dates could be established. No alternative dates were ever proposed by Kaiser, and the witnesses did not attend their scheduled depositions. McComas failed to

respond to three subsequent requests for depositions, which were made on September 5, 18, and 25. On September 24, McComas simply promised that his secretary would call to give dates for the health care providers. That did not occur until October 2, when McComas's secretary offered November 21 and 22 for the depositions of the doctors. This was the first time Kaiser had offered to produce the involved physicians, and the dates were still almost a month after Engalla's death. Although Rand ultimately convinced McComas to provide earlier dates for some (but not all) of the involved health care providers, the depositions were not taken because Engalla died before they could be completed.

As McComas subsequently admitted in a sworn declaration, the reason for the delays in scheduling depositions was that he "did not obtain all of the significant advice from [his] principal outside medical experts until early October, 1991 [and it] was for [that] reason that [he] never suggested deposition dates . . . before the fourth week of October."

### H. *Termination of the Prior Arbitration.*

Immediately upon learning of Engalla's death on October 23, Rand notified McComas of that fact and asked him to stipulate that Kaiser would not capitalize on the delays that had plagued the arbitration. Specifically, Rand explained that under the case of *Atkins* v. *Strayhorn* (1990) 223 Cal.App.3d 1380 [273 Cal.Rptr. 231], the limitation of $250,000 on noneconomic damages under Civil Code section 3333.2 for a medical malpractice suit is applied separately to the claims of a patient and his spouse who simultaneously claims loss of consortium. Because Mrs. Engalla had made such a claim, *Atkins* authorized a total claim for noneconomic damages of $500,000. However, upon the passing of Engalla, the case of *Yates* v. *Pollock* (1987) 194 Cal.App.3d 195 [239 Cal.Rptr. 383], required merger of the widow's loss of consortium claim into an indivisible claim for wrongful death, which warrants only a single general damage claim limited to $250,000. Rand's request for a stipulation to override the effect of *Yates* was refused. At that point, Rand notified McComas that the Engallas refused to continue with the arbitration.

### I. *Commencement of Court Proceedings.*

On February 21, 1992, the Engallas filed their complaint in Alameda Superior Court. They alleged, in addition to the underlying malpractice claim, fraud as a defense to enforcement of the arbitration provision of the Service Agreement (hereafter arbitration agreement) and as the basis of an affirmative claim for damages, as well as various other claims related to the

breach of the arbitration agreement. On March 20, Kaiser removed the case to the United States District Court for the Northern District of California, claiming that the action and all issues presented were subject to the rule of federal preemption contained in the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1132, 1144). About the same time, Kaiser proposed to continue the arbitration process. The Engallas declined the offer and, instead, filed a motion to remand. On June 19, the federal court granted the Engallas' motion in its entirety and remanded the matter back to state court.

Upon remand, the Engallas immediately filed a motion to compel discovery they had served prior to Kaiser's removal effort. Kaiser responded with a petition to compel arbitration and stay the court action. The parties thereafter briefed both the discovery and arbitration motions, and the trial court heard lengthy argument and took the matters under submission. On September 29, 1992, the court issued an order continuing the matter for 90 days to permit the Engallas to make their "best showing with respect to the evidentiary grounds that exist to warrant removal of this case from the arbitration process." Discovery rulings were made only with respect to discovery that specifically pertained to the arbitration (as opposed to the medical malpractice) issues.

The parties embarked upon a course of discovery which was limited in light of the summary nature of the petition Kaiser had filed. The Engallas ultimately had five months to complete discovery, during which time thirteen motions were filed and more than a dozen depositions were taken.

The parties then submitted further briefs in connection with Kaiser's petition to compel arbitration. The Engallas also moved for summary adjudication of issues, asking for a judicial determination, pursuant to section 437c, subdivision (f), that Kaiser owed them certain duties. This motion was subsequently dismissed without prejudice based on certain technical defects. The Engallas also filed a discovery motion to obtain assertedly privileged documents.

After a hearing the trial court issued its order denying Kaiser's petition after making specific findings of fact on the issue of fraud both "in the inducement" and "in the application" of the arbitration agreement. The court further found that the arbitration agreement, as applied, was overbroad, unconscionable and a violation of public policy, inasmuch as Kaiser was arguing that the agreement could not be avoided on grounds of fraudulent inducement. The court further found that equitable considerations peculiar to this case required the invalidation of the arbitration provision.

On June 4, 1993, a hearing was held on the Engallas' discovery motion. At that hearing, Kaiser's counsel advised the court that Kaiser would not appeal the decision denying the petition, conceding that the court's ruling on the petition "was quite correct." However, Kaiser later reconsidered and appealed.

The Court of Appeal reversed. It rejected the claim that Kaiser had defrauded the Engallas, finding inter alia that Kaiser's contractual representation of a 60-day time limit for the selection of arbitrators was not "a representation of fact or a promise by Kaiser because appointment of the neutral arbitrator requires the cooperation of and *mutual agreement* of the parties." (Original italics.) The court further concluded there was no evidence of actual reliance on these representations nor evidence that the Engallas would have been any better off had their claims been submitted for judicial resolution rather than arbitration. The court also found that the availability of section 1281.6, which permits one of the parties to petition the court to appoint an arbitrator when the parties fail to agree on one, undermined the Engallas' claim that Kaiser's alleged deliberate delay in selecting arbitrators was a ground for avoiding the arbitration agreement. The court further rejected the claim that Kaiser's special relationship as Engalla's insurer or as a fiduciary in the administration of his health plan created any special duty to disclose the workings of its arbitration program. Finally, the court held the Engallas' waiver and unconscionability claims to be without merit. We granted review.[6]

## II. PROCEDURAL ISSUES

Before proceeding to the merits, we must address certain procedural and threshold matters. As both parties concede, California law is expressly incorporated into the arbitration agreement in question, and governs the adjudication of any disputes arising from that agreement. (*Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468, 476 [109 S.Ct. 1248, 1254, 103 L.Ed.2d 488].) ■ California law incorporates many of the basic policy objectives contained in the Federal Arbitration Act, including a presumption in favor of arbitrability (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 323 [197

---

[6]Kaiser and its counsel also filed in the Court of Appeal separate writ petitions requesting reversal of the trial court's discovery order discussed above. The Court of Appeal granted that relief, concluding that such discovery issues should be addressed to the arbitrator. The petition for review did not request review of the Court of Appeal's decision in the writ petition, which was premised on its grant of Kaiser's petition to compel arbitration. Accordingly, we do not address the issues raised by the writ petitions in this opinion. On remand, the parties are free to make or renew any discovery request relevant to the resolution of the petition to compel arbitration.

Cal.Rptr. 581, 673 P.2d 251]) and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 709, fn. 11 [131 Cal.Rptr. 882, 552 P.2d 1178] (*Madden*)). These policies guide our determination of the present matter.

The nature of the proceeding to resolve a petition to compel arbitration under California law was recently explained by this court in *Rosenthal* v. *Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (*Rosenthal*). ■ As we explain in that case, sections 1281.2 and 1290.2 create a summary proceeding for resolving these petitions. (14 Cal.4th at p. 413.) The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. (*Ibid.*) In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination. (*Id.* at pp. 413-414.) No jury trial is available for a petition to compel arbitration. (*Id.* at p. 413.)

■ Although the record is not entirely clear on this point, it appears that the trial court in this case, as in *Rosenthal* (see *Rosenthal, supra,* 14 Cal.4th at p. 414), incorrectly treated Kaiser's petition to compel arbitration as a type of summary judgment motion, in which it was obliged to determine only that there was a legitimate factual dispute among the parties and not to resolve that dispute. The court stated at the conclusion of its ruling on the petition to compel: "In summary, the Plaintiffs have made a substantive challenge to the arbitration clause and have presented facts tending to show that they were victims of fraud in the inducement and application of the arbitration clause. *How a trier of fact will ultimately decide the issues is not for this court to decide.* However, given the seriousness of the *allegations,* the showing of a factual basis for those claims, and the finality of arbitration even in the face of apparent legal error [citation], the strong policy favoring arbitration is outweighed by the law and facts in support of Plaintiffs' position." (Italics added.) To judge from remarks made by the trial court during the hearing on the petition to compel, the court appears to have followed the reasoning of *Rowland* v. *Paine Webber Inc.* (1992) 4 Cal.App.4th 279, 285-286 [6 Cal.Rptr.2d 20], that a court must only determine whether "there are any facts supporting the allegations of fraudulent inducement." Toward the end of the hearing on the petition to compel, the trial court again alluded to cases "that have . . . talked in terms of the burden being akin to a burden on a summary judgment motion." Moreover,

both counsel for the Engallas and for Kaiser appear to have conceived their burden as one similar to summary judgment. The trial court was apparently of the view that it did not have to definitively decide the fraud issue in order to dispose of the petition, because that issue would be ultimately decided by a jury in the context of the Engallas' damages action. Because the trial court, understandably confused by case law (see *Rosenthal, supra,* 14 Cal.4th at p. 407 and cases cited therein), apparently abdicated its role as trier of fact in deciding the petition to compel arbitration, the case must be remanded to that court to resolve any factually disputed issues, unless there is no evidentiary support for the Engallas' claims. (See *id.* at p. 414.) We turn then to the question whether there was such support.[7]

### III. Fraud in the Inducement of the Arbitration Agreement

 The Engallas claim fraud in the inducement of the arbitration agreement and therefore that "[g]rounds exist for the revocation of the agreement" within the meaning of section 1281.2, subdivision (b). As has been pointed out, the "revocation of a contract" referred to in section 1281.2 is something of a misnomer. "Offers are 'revoked.' [Citation.] Contracts are extinguished by rescission." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1996) ¶ 5.111, p. 5-31, italics omitted.) We construe section 1281.2, subdivision (b), to mean that the petition to compel arbitration is not to be granted when there are grounds for rescinding the agreement. Fraud is one of the grounds on which a contract can be rescinded. (Civ. Code, § 1689, subd. (b)(1).) In order to defeat a petition to compel arbitration, the parties opposing a petition to compel must show that the asserted fraud claim goes specifically " 'to the "making" of the agreement to arbitrate,' " rather than to the making of the contract in general. (*Rosenthal, supra,* 14 Cal.4th at p. 415.) In the present case, the Engallas do allege, and seek to show, fraud in the making of the arbitration agreement.

The Engallas claim[8] that Engalla was fraudulently induced to enter the arbitration agreement—in essence a claim of promissory fraud. " 'Promissory fraud' is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.] [¶] An action for promissory fraud may lie

---

[7]In reviewing this quasi-summary-judgment motion we will "undertake[] an independent review of the evidence presented to the trial court to determine whether [any] triable issues of fact were presented." (*Schrader* v. *Scott* (1992) 8 Cal.App.4th 1679, 1683 [11 Cal.Rptr.2d 433].)

[8]For the sake of convenience, the arguments of the various amici curiae for the parties will be attributed to the parties.

where a defendant fraudulently induces the plaintiff to enter into a contract." (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) ▪ The elements of fraud that will give rise to a tort action for deceit are: " '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Ibid.*) As explained below, there is no requirement to show pecuniary damages when fraud is the basis for a defense to a petition to compel arbitration, rather than a suit for damages.

▪ Here the Engallas claim (1) that Kaiser misrepresented its arbitration agreement in that it entered into the agreement knowing that, at the very least, there was a likelihood its agents would breach the part of the agreement providing for the timely appointment of arbitrators and the expeditious progress towards an arbitration hearing; (2) that Kaiser employed the above misrepresentation in order to induce reliance on the part of Engalla and his employer; (3) that Engalla relied on these misrepresentations to his detriment. The trial court found evidence supporting those claims. We examine each of these claims in turn.

First, evidence of misrepresentation is plain. "[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." (*Yellow Creek Logging Corp.* v. *Dare* (1963) 216 Cal.App.2d 50, 55 [30 Cal.Rptr. 629].) As recounted above, section 8.B. of the arbitration agreement provides that party arbitrators "shall" be chosen within 30 days and neutral arbitrators within 60 days, and that the arbitration hearing "shall" be held "within a reasonable time thereafter." Although Kaiser correctly argues that these contractual representations did not bind it to appoint a neutral arbitrator within 60 days, since the appointment of that arbitrator is a bilateral decision that depends on agreements of the parties, Kaiser's contractual representations were at the very least commitments to exercise good faith and reasonable diligence to have the arbitrators appointed within the specified time. This good faith duty is underscored by Kaiser's contractual assumption of the duty to administer the health service plan as a fiduciary.

Here there are facts to support the Engallas' allegation that Kaiser entered into the arbitration agreement with knowledge that it would not comply with its own contractual timelines, or with at least a reckless indifference as to whether its agents would use reasonable diligence and good faith to comply with them. As discussed, a survey of Kaiser arbitrations between 1984 and

1986 submitted into evidence showed that a neutral arbitrator was appointed within 60 days in only 1 percent of the cases, with only 3 percent appointed within 180 days, and that on average the neutral arbitrator was appointed 674 days—almost 2 years—after the demand for arbitration. Regardless of when Kaiser became aware of these precise statistics, which were part of a 1989 study, the depositions of two of Kaiser's in-house attorneys demonstrate that Kaiser was aware soon after it began its arbitration program that its contractual deadlines were not being met, and that severe delay was endemic to the program. Kaiser nonetheless persisted in its contractual promises of expeditiousness.

Kaiser now argues that most of these delays were caused by the claimants themselves and their attorneys, who procrastinated in the selection of a neutral arbitrator. But Kaiser's counterexplanation is without any statistical support, and is based solely on anecdotal evidence related by Kaiser officials. Moreover, the explanation appears implausible in view of the sheer pervasiveness of the delays. While it is theoretically possible that 99 percent of plaintiffs' attorneys did not seek a rapid arbitration, a more reasonable inference, in light of common experience, is that in at least some cases Kaiser's defense attorneys were partly or wholly responsible for the delays, and Kaiser's former general counsel conceded as much in deposition testimony. It is, after all, the defense which often benefits from delay, thereby preserving the status quo to its advantage until the time when memories fade and claims are abandoned. Indeed, the present case illustrates why Kaiser's counsel may sometimes find it advantageous to delay the selection of a neutral arbitrator. There is also evidence that Kaiser kept extensive records on the arbitrators it had used, and may have delayed the selection process in order to ensure that it would obtain the arbitrators it thought would best serve its interests. Thus, it is a reasonable inference from the documentary record before us that Kaiser's contractual representations of expeditiousness were made with knowledge of their likely falsity, and in fact concealed an unofficial policy or practice of delay.

The systemwide nature of Kaiser's delay comes into clearer focus when it is contrasted with other arbitration systems. As the Engallas point out, many large institutional users of arbitration, including most health maintenance organizations (HMO's), avoid the potential problems of delay in the selection of arbitrators by contracting with neutral third party organizations, such as the American Arbitration Association (AAA). These organizations will then assume responsibility for administering the claim from the time the arbitration demand is filed, and will ensure the arbitrator or arbitrators are

chosen in a timely manner.[9] Though Kaiser is not obliged by law to adopt any particular form of arbitration, the record shows that it did not attempt to create within its own organization any office that would neutrally administer the arbitration program, but instead entrusted such administration to outside counsel retained to act as advocates on its behalf. In other words, there is evidence that Kaiser established a self-administered arbitration system in which delay for its own benefit and convenience was an inherent part, despite express and implied contractual representations to the contrary.[10]

■ A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an " 'intent to . . . induce reliance' " on it. (*Lazar* v. *Superior Court, supra*, 12 Cal.4th at p. 638.) It can be reasonably inferred in the present case that these misrepresentations of expeditiousness, which are found not only in the contract but in newsletters periodically sent to subscribers touting the virtues of the Kaiser arbitration program, were made by Kaiser to encourage these subscribers to believe that its program would function efficiently. One such newsletter stated: "In the jury trial system, a malpractice complaint takes at least three years—and frequently longer—to reach court and a typical trial lasts ten to fourteen days. Arbitration proceedings don't involve a judge or jury; can be concluded *in several months time*, and a typical hearing lasts only two days." (Italics added.) Such statements can plausibly be viewed as reflecting Kaiser's intent to induce subscription or renewal of subscription in Kaiser's health services plan by misrepresenting the actual workings of its arbitration program.

■ Kaiser also claims that the Engallas failed to demonstrate actual reliance on its misrepresentations. ■ Actual reliance occurs when a misrepresentation is " 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' " and when, absent such representation, " 'he would not, in all reasonable probability, have entered into the contract or other transaction.' " (*Spinks* v. *Clark* (1905) 147 Cal. 439, 444 [82 P. 45]; see also 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 711 at p. 810.) "It is not . . . necessary that [a plaintiff's] reliance upon the truth of the

[9]Under the AAA proceeding, for example, that organization submits simultaneously to each of the parties, shortly after the arbitration demand is filed, a list of names of possible arbitrators and their biographical information. Each party is then given 10 days to cross off the names to which it objects and to number the remaining names in order of preference. If a party does not respond within the 10-day period, all the arbitrators on the list are deemed to be acceptable to it. The AAA then selects the arbitrator or arbitrators from the list, who set a hearing date and supervise discovery. A similar procedure is employed for judicial arbitration. (See Cal. Rules of Court, rule 1605.)

[10]There is also evidence that Kaiser disseminated information through its newsletters which was seen by responsible officials in Oliver Tire, the company in which Engalla was employed, that represented Kaiser's arbitration system as fast and efficient. These misrepresentations further support the Engallas' fraud claim.

fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." (Rest.2d Torts, § 546, com. b, p. 103.)

Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; see also 12 Williston on Contracts (3d ed. 1970) § 1515, p. 480; Rest.2d, Contracts, § 167.) A misrepresentation is judged to be "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" (Rest.2d Torts, § 538, subd. (2)(a); see also *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171, 188, fn. 5 [183 Cal.Rptr. 881]), and as such materiality is generally a question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." (Rest.2d Torts, § 538, com. e, p. 82.) Thus, the Engallas need only make a showing that the misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance from such misrepresentations, in order to survive this summary-judgment-like proceeding, absent evidence conclusively rebutting reliance. (Cf. *Security Pac. Nat. Bank* v. *Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179-180 [165 Cal.Rptr. 38] [presumption which shifts the burden of proving evidence entitles plaintiff to summary judgment if defendant fails to produce evidence to rebut the presumption].)

In the present case, our assessment of the materiality of representations is somewhat complicated by the fact that the primary decision maker responsible for selecting the Kaiser health plan was not Engalla himself but his employer, Oliver Tire. The evidence shows that Engalla had little if any cognizance of the arbitration agreement, and that the form he signed to enroll in Kaiser merely stated that members' claims must be submitted to arbitration "[i]f the [health services plan] agreement so provides." On the other hand, Oliver Tire and its personnel employees were obviously aware of the arbitration provision and were responsible for scrutinizing the details of the health services plan before offering it to the company's employees. But this complication does not alter fundamentally our analysis of materiality. As we have recognized, an employer that negotiates group medical benefits for its employees acts as an agent for those employees during the period of negotiation. (*Madden, supra,* 17 Cal.3d at pp. 705-706 & fn. 5.) An agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal. (See *Fischer* v. *Machado* (1996) 50 Cal.App.4th 1069, 1072 [58 Cal.Rptr.2d 213].) Accordingly, a material representation in this case is one

that would have substantially influenced the health plan selection process of Oliver Tire, acting as an agent of its employees as a class.[11]

Applying these principles to the present case, we conclude that Kaiser's representations of expeditiousness in the arbitration agreement were not "so obviously unimportant" as to render them immaterial as a matter of law. We have recognized that expeditiousness is commonly regarded as one of the primary advantages of arbitration. " '[T]he parties to an arbitral agreement knowingly take the risks of error of fact or law committed by the arbitrators . . . in order to obtain *speedy* decisions by experts in the field whose practical experience and worldly reasoning will be accepted as correct by other experts.' " (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 12 [10 Cal.Rptr.2d 183, 832 P.2d 899], italics added.) We have accordingly rejected, as a general proposition, the claim that arbitration agreements between an HMO and its participants are inherently one-sided in favor of the former. "The speed and economy of arbitration, in contrast to the expense and delay of a jury trial, could prove helpful to all parties . . . ." (*Madden, supra,* 17 Cal.3d at p. 711.) The explicit and implicit representations contained in Kaiser's arbitration agreement serve to confirm to the reasonable potential subscriber that Kaiser has an efficient system of arbitration, in which what is lost in terms of jury trial rights would be gained in part by a swifter resolution of the dispute. If it is indeed the case that these representations were false, and concealed an arbitration process in which substantial delay was the rule and timeliness the rare exception, then we cannot say these misrepresentations were so trivial that they would not have influenced a reasonable employer's decision as to which among the many competing employee health plans it would choose for its employees.

Kaiser argues to the contrary that the existence of section 1281.6 negates any possible materiality that its misrepresentation of expeditiousness may have had. That section states in pertinent part that in the absence of an agreed method of appointing an arbitrator, "or if the agreed method fails or for any reason cannot be followed . . . the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." (*Ibid.*) But the mere fact

---

[11]We recognize, of course, that this inverse agency relationship between the employer and its employees is a narrow one, and does not preclude an employer from acting in its own interests to obtain cost savings for the enterprise as a whole when choosing a group health plan. But, within these constraints, an employer negotiating or selecting a group health plan on behalf of its employees is presumed to be acting in their interest. If that proves not to be the case, then an employee bound by an arbitration agreement of which he was scarcely aware could well raise a claim that such agreement was unconscionable. (See *Madden, supra,* 17 Cal.3d at p. 711.) In the present case, the deposition testimony of Oliver Tire personnel confirms that the company acted with its employees' interests in mind in selecting a group health plan.

that there is a statutory remedy to expedite the arbitrator selection process does not necessarily render the reality of Kaiser's systematic delay irrelevant to the selection of a health plan. A party's success in having a section 1281.6 petition granted is not necessarily assured, nor is it costless, nor is it in accord with normal expectations of arbitration participants, who view arbitration as an alternative to the courts. " 'Typically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts.' " (*Moncharsh* v. *Heily & Blase, supra,* 3 Cal.4th at p. 9.) Given the reality that there exists a considerable number of roughly comparable group health plans (see *How Good Is Your Health Plan?* (Aug. 1996) Consumer Reports, at pp. 28, 40-41), a reasonable employer choosing a health plan for its employees may very well decline to select a plan with a dysfunctional arbitration system requiring court supervision.

Nor is there any evidence to conclusively rebut the inference of Oliver Tire's reliance on Kaiser's representations of expeditiousness. Kaiser claims to the contrary that the company paid scant attention to the arbitration clause, focusing in particular on the statement of Theodomeir Roy, a personnel officer with Oliver Tire who advised the company in its selection of employee health plans, that he "would not be concerned if [the plan] didn't [have an arbitration clause]. And in fact if it did, as it has here, [we] sort of look with favor on it, thinking that it was an expeditious way to resolve disputes." Yet although Roy may have been indifferent to whether arbitration or some other effective dispute resolution mechanism was available, the evidence suggests he would have looked unfavorably on a system such as Kaiser is alleged to have actually had, which delayed the resolution of claims, required constant action by the claimant, and failed to adhere to its own contractual terms. There is therefore sufficient evidence to support the claim that Oliver Tire actually relied on Kaiser's misrepresentations.

■ We turn then to the question of injury. ■ A defrauded party has the right to rescind a contract, even without a showing of pecuniary damages, on establishing that fraudulent contractual promises inducing reliance have been breached. (See *Earl* v. *Saks & Co.* (1951) 36 Cal.2d 602, 611 [226 P.2d 340]; see also Calamari & Perillo, The Law of Contracts (3d ed. 1987) § 9.16, p. 360; Rest. 2d, Contracts, § 164, com. c, pp. 446-447.) The rule derives from the basic principle that a contracting party has a right to what it contracted for, and so has the right "to rescind where he obtain[ed] something substantially different from that which he [is] led to expect." (*Earl* v. *Saks & Co., supra,* 36 Cal.2d at p. 612.) It follows that a defrauded party does not have to show pecuniary damages in order to defeat a petition to compel arbitration. ■ Of course, the Engallas cannot defeat a

petition to compel arbitration on the mere showing that Kaiser has engaged generally in fraudulent misrepresentation about the speed of the arbitration process. Rather, they must show that in their particular case, there was substantial delay in the selection of arbitrators contrary to their reasonable, fraudulently induced, contractual expectations. Here, there is ample evidence to support the Engallas' contention that Kaiser breached its arbitration agreement by repeatedly delaying the timely appointment of an available party arbitrator and a neutral arbitrator.

To be sure, the mere fact that the selection of arbitrators extended beyond their 30- and 60-day deadlines does not by itself establish that Kaiser breached its arbitration agreement. It is, after all, the malpractice claimant in arbitration, like the plaintiff in litigation, who bears the primary responsibility of exercising diligence in order to advance progress towards the resolution of its claim (see *Burgess* v. *Kaiser Foundation Hospitals* (1993) 16 Cal.App.4th 1077, 1081-1082 [20 Cal.Rptr.2d 488]), and Kaiser is under no obligation to press for appointment of arbitrators when a claimant is himself dilatory. Nor is the contract breached when delay in the selection of arbitrators is the result of reasonable disagreements over arbitrator selection. Nonetheless, as explained above, Kaiser, by agreeing to 30- and 60-day periods for the appointment of arbitrators, committed itself to cooperate with reasonable diligence and good faith in the process of appointing the arbitrators within the specified times. (See *Frey & Horgan Corp.* v. *Superior Court* (1936) 5 Cal.2d 401, 404 [55 P.2d 203].) Here, there is strong evidence that, despite a high degree of diligence on the part of Engalla's counsel in attempting to obtain the timely appointment of arbitrators, Kaiser lacked either reasonable diligence or good faith, or both, in cooperating on these timely appointments. Instead, the evidence shows that it engaged in a course of nonresponse and delay and added extracontractual conditions to the arbitration selection process, such as the requirement that the claimant name a party arbitrator first. Thus, strong evidence supports the conclusion that Kaiser did not fulfill its contractual obligations in this case to appoint arbitrators in a timely manner.

Nor does the presence of section 1281.6 excuse Kaiser's alleged misfeasance, as Kaiser contends. That section, as explained above, provides a statutory method for resolving breakdowns in the arbitrator selection process, and states in pertinent part that in the absence of an agreed method of appointing an arbitrator, "or if the agreed method fails or for any reason cannot be followed . . . the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." Kaiser contends that section 1281.6 is implicitly incorporated into the contract, which specifies that California law be followed. Yet the availability of section 1281.6 does not absolve

Kaiser of its explicit and implicit contractual duties to timely select a neutral arbitrator and to not obstruct progress towards arbitration. All section 1281.6 provides is a *remedy* for the breach of those duties of which parties may avail themselves. As noted, this remedy compels claimants to go into superior court and seek specific performance of the arbitration agreement, forcing them to engage in at least some litigation in order to vindicate their rights and thereby violating the usual expectations of an arbitration agreement. (See *Moncharsh* v. *Heily & Blase, supra,* 3 Cal.4th at p. 9.) Nothing in the language of section 1281.6 compels a party to seek this remedy, nor does this language suggest that resort to section 1281.6 is a precondition to opposing successfully a petition to compel arbitration when the petitioning party has engaged in fraud. Rather, section 1281.6 appears to be simply a legislative means of implementing this state's policy in favor of arbitration by permitting parties to an arbitration contract to expedite the arbitrator selection process.

Of course, when a delay in the selection of arbitrators is the result of a reasonable and good faith disagreement between parties, or of some other reasonable cause, the remedy for such delay may indeed be a section 1281.6 petition rather than the abandonment of the arbitration agreement. But a party that imposes and administers its own arbitration program, that fraudulently misrepresents the speed of the arbitrator selection process so as to induce reliance, and that in fact engages in conduct forcing substantial delay, may not then compel arbitration by contending that the other party failed to resort to the court by filing a section 1281.6 petition.

In sum, we conclude there is evidence to support the Engallas' claims that Kaiser fraudulently induced Engalla to enter the arbitration agreement in that it misrepresented the speed of its arbitration program, a misrepresentation on which Engalla's employer relied by selecting Kaiser's health plan for its employees, and that the Engallas suffered delay in the resolution of its malpractice dispute as a result of that reliance, despite Engalla's own reasonable diligence. The trial court, on remand, must resolve conflicting factual evidence[12] in order to properly adjudicate Kaiser's petition to compel arbitration.[13]

---

[12]On remand the trial court may, at its discretion, rely on the documentary evidence already presented, may request further documentary submissions, or may request oral testimony. (See *Rosenthal, supra,* 14 Cal.4th at p. 414.)

[13]The Engallas also argue "constructive fraud" based on Kaiser's duty, as a fiduciary, to disclose the actual workings of its arbitration system, including systemwide delay. Constructive fraud consists of "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him." (Civ. Code, § 1573.) It is

## IV. WAITER

The Engallas also claim the petition to compel arbitration should be denied on grounds of waiver. For reasons discussed below, we conclude that their waiver claims may have merit, but that the question of waiver must be determined by the trial court on remand.

Section 1281.2, subdivision (a), provides that a trial court shall refuse to compel arbitration if it determines that "[t]he right to compel arbitration has been waived by the petitioner." The Engallas argue that Kaiser's various dilatory actions constituted a waiver of its right to compel arbitration.

As a threshold matter, Kaiser argues that this waiver claim should be resolved by an arbitrator rather than by the court. Kaiser asserts that "arbitrators have exclusive jurisdiction to decide not only the substantive merits of a controversy but also any procedural disputes that precede the arbitration hearing," and that the Engallas' waiver claim is such a "procedural" dispute. In support of this assertion, it cites *John Wiley & Sons* v. *Livingston* (1964) 376 U.S. 543, 556-558 [84 S.Ct. 909, 917-919, 11 L.Ed.2d 898]. That case is inapposite. There the court considered an arbitration agreement that was part of the grievance machinery established by a labor management contract. There was no question that the parties had a valid and enforceable arbitration agreement, and no claim that the agreement had been waived. The court held rather that the question whether the parties had properly exhausted their remedies in the preliminary stages of the grievance process prior to invoking their right to arbitration—that is, whether a party's arbitration rights were invoked prematurely—was for the arbitrator to decide. (*Id.* at pp. 557-558 [84 S.Ct. at pp. 918-919].) "Once it is determined, . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." (*Id.* at p. 557 [84 S.Ct. at p. 918].) Here, the question is different and more fundamental—whether Kaiser, by its delay or by other acts or omissions, has in fact waived its right to compel arbitration. Section 1281.2, subdivision (a), gives the trial court jurisdiction to decide this question when petitioned to compel arbitration.[14]

Turning to the substance of the waiver claim, we have explained that the term "waiver" has a number of meanings in statute and case law.

generally asserted against a fiduciary by one to whom a fiduciary duty is owed. (See, e.g., *Estate of Gump* (1991) 1 Cal.App.4th 582, 601 [2 Cal.Rptr.2d 269].) "Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such where the parties stand in a fiduciary relationship." (*Ibid.*) Because we conclude the Court of Appeal must be reversed on the Engallas' *actual* fraud theory, we need not and do not address the question of constructive fraud.

[14]Kaiser also claims that support for its position that the waiver issue is for the arbitrator can be found in *Brock* v. *Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790 [13

(*Platt Pacific, Inc.* v. *Andelson* (1993) 6 Cal.4th 307, 315 [24 Cal.Rptr.2d 597, 862 P.2d 158].) "Generally, 'waiver' denotes the voluntary relinquishment of a known right. But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to . . . relinquish the right." (*Ibid.*) The varied meanings of the term "waiver" are reflected in the case law on the enforcement of arbitration agreements. "In the past, California courts have found a waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration [citations] to instances in which the petitioning party has unreasonably delayed in undertaking the procedure. [Citations.] The decisions likewise hold that the 'bad faith' or 'wilful misconduct' of a party may constitute a waiver and thus justify a refusal to compel arbitration. [Citation.] [¶] Although a number of authorities properly caution that a waiver of arbitration is not to be lightly inferred [citation], our cases establish that no single test delineates the nature of the conduct of a party that will constitute such a waiver. As our court stated in *Sawday* v. *Vista Irrigation Dist.* [(1966)] 64 Cal.2d 833, 836 [52 Cal.Rptr. 1, 415 P.2d 816]; 'Whether there has been a waiver of a right to arbitrate is ordinarily a question of fact, and a finding of waiver, if supported by sufficient evidence, is binding on an appellate court. [Citations.]' " (*Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418, 425-426 [158 Cal.Rptr. 828, 600 P.2d 1060] (*Davis*); see also *Platt Pacific, Inc.* v. *Andelson, supra,* 6 Cal.4th at pp. 315-316.)

 The Engallas claim that unreasonable delay and bad faith found in Kaiser's dilatory conduct in choosing arbitrators constituted a form of waiver, and that Kaiser's petition to compel arbitration accordingly should be denied.

 As we explained in *Davis*, the question of waiver is one of fact, and an appellate court's function is to review a trial court's findings regarding waiver to determine whether these are supported by substantial evidence. The trial court in this case made no findings regarding the Engallas' waiver claim, focusing instead on their fraud claim, which has therefore been our primary focus as well. Given the summary-judgment-like posture

Cal.Rptr.2d 678]. In that case, the plaintiff filed a medical malpractice claim against Kaiser, and the claim was stayed by the trial court pursuant to section 1281.4 after the parties stipulated to submit to contractual arbitration. After more than five years had elapsed, Kaiser filed a petition in the trial court for dismissal of the action on grounds of delay. The Court of Appeal held the trial court had no jurisdiction to dismiss the case, but that any such action must be taken by the arbitrator. (10 Cal.App.4th at p. 1808.) In the present case, unlike *Brock*, one of the parties to the arbitration claims the other party has waived its right to compel arbitration within the context of a petition to compel arbitration. Section 1281.2, subdivision (a), gives the court jurisdiction to decide such a waiver claim.

of the present case, our sole task is to review the record to determine whether there are facts to support the Engallas' waiver claim. We conclude that the evidence of Kaiser's course of delay, reviewed extensively above, which was arguably unreasonable or undertaken in bad faith, may provide sufficient grounds for a trier of fact to conclude that Kaiser has in fact waived its arbitration agreement.

We emphasize, as we explained in our discussion of fraud, that the delay must be substantial, unreasonable, and in spite of the claimant's own reasonable diligence. When delay in choosing arbitrators is the result of reasonable and good faith disagreements between the parties, the remedy for such delay is a petition to the court to choose arbitrators under section 1281.6, rather than evasion of the contractual agreement to arbitrate. The burden is on the one opposing the arbitration agreement to prove to the trial court that the other party's dilatory conduct rises to such a level of misfeasance as to constitute a waiver (see *Rosenthal, supra,* 14 Cal.4th at p. 413), and such waiver "is not to be lightly inferred" (*Davis, supra,* 25 Cal.3d at p. 426). In this case, there is ample evidence that the claimant was diligent in seeking Kaiser's cooperation, and instead suffered from Kaiser's delay, a delay which was unreasonable or in bad faith. We leave it to the trial court to determine on remand whether waiver of the right to compel arbitration has in fact occurred.

## V. UNCONSCIONABILITY

We turn then to the Engallas' unconscionability argument. We have required that "contractual arrangement[s] for the nonjudicial resolution of disputes" must possess " 'minimum levels of integrity.' " (*Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 827 [171 Cal.Rptr. 604, 623 P.2d 165].) Thus, in *Graham* v. *Scissor-Tail, Inc.,* we held that an arbitration agreement that called for the selection of an arbitrator affiliated with one of the parties to the contract was unconscionable. (*Ibid.*) In addition to the general doctrine of unconscionability derived from contract law, HMO's such as Kaiser are regulated by the Knox-Keene Health Care Service Plan Act, which provides among other things that all contracts made in connection with a health service plan be "fair, reasonable, and consistent with the objectives" of that statute. (Health & Saf. Code, § 1367, subd. (h).) HMO's are therefore especially obligated not to impose contracts on their subscribers that are one-sided and lacking in fundamental fairness.

In determining whether a contract term is unconscionable, we first consider whether the contract between Kaiser and Engalla was one of adhesion. (See *Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d at p. 817.) In *Madden,*

*supra*, 17 Cal.3d 699, we held that an agreement between Kaiser and a state employee was not a true contract of adhesion, although Kaiser's health plan was offered to state employees "on a 'take it or leave it' basis without opportunity for individual bargaining." (*Id.* at p. 710.) We reasoned that the Kaiser contract was not adhesive because (1) it "represents the product of negotiation between two parties, Kaiser and the [State Employees Retirement System], possessing parity of bargaining strength" and (2) the state employee could choose from among a number of different health plans, and thus was not confronted with the choice typical of a contract of adhesion of "either adher[ing] to the standardized agreement or forego[ing] the needed service." (*Id.* at p. 711.) We also found that the arbitration clause in question was not, unlike the unconscionable clauses in adhesion contracts, a term that limits the liability or obligations of a stronger party, but rather "could prove helpful to all parties." (*Ibid.*)

The present agreement, which was also offered to Engalla on a "take it or leave it" basis, has more of the characteristics of an adhesion contract than the one considered in *Madden*. First, although Oliver Tire is a corporation of considerable size, it has had only a small number of employees enrolled in Kaiser, and did not have the strength to bargain with Kaiser to alter the terms of the contract. Second, Engalla did have one other health plan from which to choose, but not several plans as was the case in *Madden*. Finally, unlike in *Madden*, the Engallas do not claim that the arbitration clause itself is unconscionable, but that the arbitration program Kaiser established was biased against them.

Nonetheless, although the present contract has some of the attributes of adhesion, it did not, *on its face*, lack " 'minimum levels of integrity.' " (*Graham* v. *Scissor-Tail, Inc.*, *supra*, 28 Cal.3d at p. 827.) The unfairness that is the substance of the Engallas' unconscionability argument comes essentially to this: The Engallas contend that Kaiser has established a system of arbitration inherently unfair to claimants, because the method of selecting neutral arbitrators is biased. They claim that Kaiser has an unfair advantage as a "repeat player" in arbitration, possessing information on arbitrators that the Engallas themselves lacked. They also argue that Kaiser, under its arbitration system, has sought to maximize this advantage by reserving for itself an unlimited right to veto arbitrators proposed by the other party. This method is in contrast to arbitration programs run by neutral, third party arbitration organizations such as the AAA, which give parties a very limited ability to veto arbitrators from its preselected panels.[15]

Yet none of these features of Kaiser's arbitration program renders the arbitration agreement per se unconscionable. As noted above, section 1281.6

---

[15]See footnote 9, *ante*, at page 976, for an explanation of AAA's procedures.

specifically contemplates a system whereby neutral arbitrators will be chosen directly by the parties. The alleged problem with Kaiser's arbitration in this case was not any defect or one-sidedness in its contractual provisions, but rather in the gap between its contractual representations and the actual workings of its arbitration program. It is the doctrines of fraud and waiver, rather than of unconscionability, that most appropriately address this discrepancy between the contractual representation and the reality. Thus, viewing the arbitration agreement on its face, we cannot say it is unconscionable.[16]

## VI. Conclusion and Disposition

For the foregoing reasons, the judgment of the Court of Appeal is reversed with directions to remand the case for proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.**—I concur in the majority opinion. I write separately to note that this case illustrates yet again the essential role of the courts in ensuring that the arbitration system delivers not only speed and economy but also fundamental fairness.

Unfairness in arbitration sufficiently extreme to justify court intervention can take many forms. As I have previously stated, in my view courts have the power to overturn an arbitrator's decision if it contains manifest error that causes substantial injustice. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 36-40 [10 Cal.Rptr.2d 183, 832 P.2d 899] (dis. opn. of Kennard, J.).) It is also my view that arbitrators are limited to the same remedies that a court could award under the circumstances of the case, and that a court may overturn an arbitrator's award of relief that exceeds that limit. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 394-395, 400-401 [36 Cal.Rptr.2d 581, 885 P.2d 994] (dis. opn. of Kennard, J.).)

---

[16]We note that after review was granted in this case, the Legislature enacted Senate Bill No. 1660 (1995-1996 Reg. Sess.) amending Health and Safety Code section 1373.19 and adding Health and Safety section 1373.20. Health and Safety Code section 1373.20 specifically addresses a situation in which a health care service plan does not use "a professional dispute resolution organization independent of the plan" to settle arbitration disputes. For such organizations, Health and Safety Code section 1373.20 provides a means of expediting the procedures set forth in Code of Civil Procedure section 1281.6, mandating the trial court to "conclusively presume[]" that the agreed method of selecting arbitrators has failed 30 days after one party has served a written demand to designate an arbitrator upon the other one. That section also provides for an award of the reasonable cost of a section 1281.6 petition when the court finds a party's conduct to be "dilatory." We express no opinion whether this new legislation would affect our analysis of cases such as the present.

This case illustrates the role that courts play in maintaining the procedural fairness, as well as the substantive fairness, of arbitration proceedings. Procedural manipulations can be used by a party not only to delay and obstruct the proceedings, thereby denying the other party the speed and efficiency that are the arbitration system's primary justification, but also to affect the possible outcome of the arbitration. As to speed and efficiency, the Kaiser arbitration provision provides for appointment of a neutral arbitrator within a 60-day period. (See maj. opn., *ante,* at p. 962, fn. 3.) In reality, a neutral arbitrator was appointed within 60 days in less than 1 percent of Kaiser's arbitrations; the appointment occurred within 180 days (3 times the contractual time period) in less than 3 percent of Kaiser's arbitrations. Indeed, the *average* time for appointment of a neutral arbitrator was *674 days,* more than 11 times the contractual time period. The *average* time for a Kaiser-administered arbitration hearing to *begin* (not conclude) was *863 days* or almost 30 months. (*Id.* at p. 967.) Although the comparison is not exact, it is instructive to compare the "speed" of Kaiser's arbitration process to the speed of judicial proceedings in Alameda County Superior Court, where this action was filed. During the 1993-1994 fiscal year that court disposed of 96 percent of its civil cases in less than 24 months. (Judicial Council of Cal., Annual Data Reference, 1993-94 Caseload Data by Individual Courts, table No. 22, p. 52.)

By delaying arbitration in this case until after Wilfredo Engalla died, Kaiser also affected the potential outcome of his malpractice claims. Engalla's death reduced Kaiser's potential liability for noneconomic damages to $250,000 from the $500,000 potential liability it would have faced had the claims been arbitrated during Engalla's life. (See maj. opn., *ante,* at p. 969.)

As the majority opinion makes clear, courts must be alert to procedural manipulations of arbitration proceedings and should grant appropriate relief when such manipulations occur. As here, such conduct may give rise to claims of fraud in the inducement of the arbitration agreement or claims that the manipulating party has waived its right to enforce the arbitration agreement. Moreover, if such conduct affects the arbitration award, it may form the basis for vacating the award as one "procured by corruption, fraud or other undue means." (Code Civ. Proc., § 1286.2, subd. (a).)

Finally, it is worth noting that new possibilities for unfairness arise as arbitration ventures beyond the world of merchant-to-merchant disputes in which it was conceived into the world of consumer transactions (like the

health care agreement in this case) and nonunion employment relationships.[1] In such cases, the assumption that the parties have freely chosen arbitration as a dispute resolution mechanism in a process of arm's-length negotiation may be little more than an illusion. Unlike the traditional model of arbitration agreements negotiated between large commercial firms with equal bargaining power, consumer and employment arbitration agreements are typically "take it or leave it" propositions, contracts of adhesion in which the only choice for the consumer or the employee is to accept arbitration or forego the transaction. And the fact that the business organization imposing the arbitration clause is a repeat player in the arbitration system, while the consumer or employee is not, raises the potential that arbitrators will consciously or unconsciously bias their decisions in favor of an organization or industry that hires them regularly as an arbitrator.

Here, neither plaintiffs' decedent nor his employer was afforded an opportunity to accept or reject arbitration as the means of resolving disputes. Rather, Kaiser's standard health care agreement, which included the arbitration requirement, was presented on a "take it or leave it" basis. (See maj. opn., *ante,* at p. 985.) There was no true bargaining involved here. Moreover, although Kaiser appears to have led its members to believe that Kaiser administered its arbitration system fairly and as a "fiduciary" (*id.* at p. 962), in reality the opposite may have been true. Kaiser "administered" its arbitration system through its defense attorneys, who appear to have manipulated the process to Kaiser's advantage. (*Id.* at pp. 975-976.)

---

[1]Legislation is pending on both the state and federal levels to address some of the unique problems of arbitration agreements governing consumer and nonunion employment disputes. At the state level, legislation is currently pending that would make arbitrations conducted under standardized employment, health care, and consumer contracts reviewable for legal error that causes a miscarriage of justice; in addition, a party could require the arbitrator in such a case to give a written explanation of the basis for the award. (Sen. Bill No. 19 (1997-1998 Reg. Sess.), approved by Sen., May 8, 1997.)

Also at the state level, legislation has been introduced to prohibit enforcement of predispute arbitration agreements in the case of nonunion employment disputes. (Assem. Bill No. 574 (1997-1998 Reg. Sess.).) At the national level, legislation has been introduced to prohibit enforcement of predispute arbitration agreements in the case of employment discrimination claims arising under federal civil rights laws. (Sen. No. 63, H.R. No. 983, 105th Cong., 1st Sess. (1997).)

I also note that a major provider of arbitration services, the American Arbitration Association, has recently promulgated special rules governing the arbitration of employment disputes. (American Arbitration Association, National Rules for the Resolution of Employment Disputes (eff. June 1, 1996).) The stated purpose of these rules is to "meet . . . due process standards" and "administer cases in accordance with the law." (*Id.* at p. 3.) Among other features, the rules provide that in employment disputes the award "shall provide the written reasons for the award unless the parties agree otherwise." (*Id.,* rule 32(b).) And the chairman of the National Labor Relations Board has recently called for reform of nonunion employment arbitration to ensure that it meets basic criteria of fairness. (Debare, *NLRB Chief Gould Backs Rules for Arbitration,* S. F. Chronicle (Apr. 10, 1997) p. C1.)

Private arbitration may resolve disputes faster and cheaper than judicial proceedings. Private arbitration, however, may also become an instrument of injustice imposed on a "take it or leave it" basis. The courts must distinguish the former from the latter, to ensure that private arbitration systems resolve disputes not only with speed and economy but also with fairness.

BROWN, J., Dissenting.—The intended target of the majority's wrath—the Permanente Medical Group, Inc., Kaiser Foundation Hospitals, and the Kaiser Foundation Health Plan (hereafter Kaiser)—could not be more deserving. I write separately to represent the interests of the unintended victim of the majority's holding—private arbitration in California.

## I. INTRODUCTION

Pursuant to the terms of a prior written agreement, the parties in this case submitted a medical malpractice dispute to private, or nonjudicial, arbitration. California law, like corresponding federal law under the United States Arbitration Act (9 U.S.C. §§ 1-16), has long reflected a strong policy in favor of such arbitration.

As this court recently explained, "Title 9 of the Code of Civil Procedure,[1] as enacted and periodically amended by the Legislature, represents a comprehensive statutory scheme regulating private arbitration in this state. (§ 1280 et seq.) Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.] Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' [Citations.] Indeed, more than 70 years ago this court explained: 'The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' [Citation.] 'Typically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts.' " (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

Although the majority purports to "affirm the basic policy in favor of enforcement of arbitration agreements" (maj. opn., *ante*, at p. 960), it nonetheless concludes that "the governing statutes place limits on the extent to which a party that has committed *misfeasance in the performance* of such an agreement may compel its enforcement." (*Ibid.*, italics added.) I cannot

---

[1]Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

agree with the majority's interpretation of the governing statutory framework. In my view, except for seeking statutorily prescribed court assistance in the arbitrator selection process (see *post*, at pp. 992-994), once a private arbitration is pending, a party must seek relief for its adversary's "misfeasance in the performance" in the arbitral forum, not in the courts. Make no mistake about it. The majority's decision to validate a party's unilateral withdrawal from a pending arbitration based on the conduct of its arbitration adversary will wreak havoc on arbitrations throughout the state. Therefore, I respectfully dissent.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Almost lost in the majority's exhaustive procedural summary is one key fact—namely, the arbitration process was already underway by the time the plaintiffs unilaterally withdrew. A brief review of the history of the arbitration is in order.

On May 31, 1991,[2] pursuant to the terms of a "group medical and hospital services agreement," Wilfredo Engalla, his wife, and their four children (hereafter the Engallas) demanded that Kaiser submit a medical malpractice dispute to binding private arbitration. On June 17, Kaiser submitted to the Engallas' arbitration demand. Two days later, the Engallas' counsel sent Kaiser the $150 check "required in order to initiate the arbitration proceeding."

The Engallas designated their party arbitrator on July 8, Kaiser designated its party arbitrator on July 17, and the parties confirmed their agreement on a neutral arbitrator on October 22. While the parties were in the process of designating arbitrators, they exchanged a number of discovery requests.

Thereafter, on October 28, the Engallas refused to continue with the pending arbitration.[3] The reason the Engallas withdrew from the arbitration was that Kaiser declined to stipulate that Mrs. Engalla's separate loss of consortium claim survived her husband's death. It is this unilateral withdrawal from a pending arbitration that the majority's decision validates.

---

[2] Unless otherwise indicated, all further references to dates are to the year 1991.

[3] In my view, the private arbitration commenced on June 17, the date Kaiser submitted to the Engallas' arbitration demand. Even if the arbitration could somehow be deemed to have commenced on a later date, it is beyond peradventure that the arbitration was pending as of October 28, the date of the Engallas' unilateral withdrawal. By this time, the parties had already designated both the party arbitrators and the neutral arbitrator. Thus, the majority properly characterizes the Engallas' actions on October 28 as the "[t]ermination of the [p]rior [a]rbitration." (Maj. opn., *ante*, at p. 969.) Similarly, in a declaration submitted to the trial court, the Engallas' counsel correctly references "the termination of the arbitration proceedings."

## III. Discussion

In evaluating both the Engallas' fraudulent inducement claim and their waiver claim, the majority focuses on Kaiser's *performance* during the course of the aborted private arbitration. According to the majority, the sine qua non of successful fraudulent inducement and waiver claims is unreasonable or bad faith delay by Kaiser. (Maj. opn., *ante*, at pp. 979-980, 984.) Thus, the majority permits the fraudulent inducement claim to proceed because "there is strong evidence that, despite a high degree of diligence on the part of the Engallas' counsel in attempting to obtain the timely appointment of arbitrators, Kaiser lacked either reasonable diligence or good faith, or both, in cooperating on these timely appointments." (*Id.* at p. 980.) Likewise, the majority permits the waiver claim to proceed because "there is ample evidence that the [Engallas were] diligent in seeking Kaiser's cooperation, and instead suffered from Kaiser's delay, a delay which was unreasonable or in bad faith." (*Id.* at p. 984.)

Although the majority's desire to penalize Kaiser's obduracy is understandable, the consequences of validating a party's unilateral withdrawal from a pending arbitration based on the conduct of its arbitration adversary will reverberate far beyond the bad facts of the instant case. In stark contrast to the legislative response, which enhances the procedures for *keeping* a case in private arbitration (see *post*, at pp. 993-994), the majority expands the procedures for *removing* a case from arbitration. The majority maintains that section 1281.2 compels its decision. (See maj. opn., *ante*, at pp. 973, 982-983 & fn. 14.) I cannot agree. That statute delineates certain narrow circumstances in which a trial court may uphold a party's "refus[al] to arbitrate." (§ 1281.2.) Nothing in section 1281.2 permits a party that has previously *submitted* a dispute to arbitration, and thereby *agreed to arbitrate*, to *withdraw* from that arbitration at some later date based on the unreasonable or bad faith delay of its adversary.

To construe section 1281.2 in the sweeping fashion advanced by the majority will seriously compromise the integrity of the arbitral process and will impose an unpredictable and unnecessary burden on our trial courts. It is well established that "contractual arbitration has a life of its own outside the judicial system." (*Brock* v. *Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790, 1805 [13 Cal.Rptr.2d 678]; see also *Nanfito* v. *Superior Court* (1991) 2 Cal.App.4th 315, 318 [2 Cal.Rptr.2d 876]; *Byerly* v. *Sale* (1988) 204 Cal.App.3d 1312, 1316 [251 Cal.Rptr. 749].) "It is the job of the arbitrator, not the court, to resolve all questions needed to determine the

controversy. [Citations.] The arbitrator, and not the court, decides questions of procedure and discovery. [Citations.] It is also up to the arbitrator, and not the court, to grant relief for delay in bringing an arbitration to a resolution." (*Titan/Value Equities Group, Inc.* v. *Superior Court* (1994) 29 Cal.App.4th 482, 487-488 [35 Cal.Rptr.2d 4], fns. omitted.)

"This does not mean that a party to an arbitration proceeding has no remedy against dilatory tactics." (*Brock* v. *Kaiser Foundation Hospitals, supra,* 10 Cal.App.4th at p. 1808.) Rather, a party who has suffered as a result of such tactics may seek appropriate relief in the arbitral forum. (*Ibid.*; see also *Titan/Value Equities Group, Inc.* v. *Superior Court, supra,* 29 Cal.App.4th at p. 488; *Nanfito* v. *Superior Court, supra,* 2 Cal.App.4th at pp. 318-319; *Byerly* v. *Sale, supra,* 204 Cal.App.3d at p. 1316; *Young* v. *Ross-Loos Medical Group, Inc.* (1982) 135 Cal.App.3d 669, 673 [185 Cal.Rptr. 536].)

Nor does the fact that the arbitrator selection process in a given private arbitration has not yet been completed preclude a party from obtaining appropriate relief. To the contrary, section 1281.6 provides a mechanism by which a party can seek limited assistance from the trial court in obtaining the appointment of an arbitrator or arbitrators.[4] (*Burgess* v. *Kaiser Foundation Hospitals* (1993) 16 Cal.App.4th 1077, 1079, 1081-1082 [20 Cal.Rptr.2d 488]; *Brock* v. *Kaiser Foundation Hospitals, supra,* 10 Cal.App.4th at pp. 1803-1804; *American Home Assurance Co.* v. *Benowitz* (1991) 234 Cal.App.3d 192, 198-202 [285 Cal.Rptr. 626]; *Boutwell* v. *Kaiser Foundation Health Plan* (1988) 206 Cal.App.3d 1371, 1374 [254 Cal.Rptr. 173]; *Young* v. *Ross-Loos Medical Group, Inc., supra,* 135 Cal.App.3d at pp. 674-675; *Cook* v. *Superior Court* (1966) 240 Cal.App.2d 880, 887 [50 Cal.Rptr. 81].) "[O]nce there is an arbitrator appointed pursuant to section 1281.6, the party seeking to expedite the arbitration proceedings can apply to the arbitrator for [appropriate relief]." (*Brock* v. *Kaiser Foundation Hospitals, supra,* 10 Cal.App.4th at p. 1804.)

---

[4]Section 1281.6 provides that "if the agreed method [of appointing an arbitrator] fails or for any reason cannot be followed, . . . the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." The United States Arbitration Act affords a nearly identical remedy. (See 9 U.S.C. § 5.)

As noted above, the parties in this case had already designated both the party arbitrators and the neutral arbitrator by the time the Engallas unilaterally withdrew from the pending arbitration. Therefore, the majority's discussion of whether the Engallas should have invoked section 1281.6 at some earlier point in the arbitration is largely beside the point. (See maj. opn., *ante,* at pp. 980-981, 983-984.) Rather, as discussed in the text, since the arbitration panel was already in place, the Engallas should have sought appropriate relief from the arbitrators. Nonetheless, since the majority deems it necessary to discuss section 1281.6, I address my differences with the majority's view of that statute.

I do not share the majority's view that requiring a party to a private arbitration to file a section 1281.6 petition would "violat[e] the usual expectations of an arbitration agreement." (Maj. opn., *ante*, at p. 981.) The majority's reliance on the statement in *Moncharsh* v. *Heily & Blase, supra*, 3 Cal.4th at page 9, that " '[t]ypically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts' " (maj. opn., *ante*, at p. 979), is misplaced. *Moncharsh* did not hold that a party to a private arbitration would *never* have to have any contact with the courts but rather that "judicial intervention in the arbitration process [should] be *minimized*. [Citations.]" (*Moncharsh* v. *Heily & Blase, supra*, 3 Cal.4th at p. 10, italics added.) Indeed, the very paragraph of *Moncharsh* quoted by the majority emphasizes that title 9 of part 3 of the Code of Civil Procedure—which includes section 1281.6—"represents a comprehensive statutory scheme regulating private arbitration in this state. [Citation.]" (*Moncharsh* v. *Heily & Blase, supra*, 3 Cal.4th at p. 9.)

Section 1281.6 is the statutory remedy that our Legislature has provided for *resolving* disputes in the arbitrator selection process, thereby preventing such disputes from becoming occasions for avoiding private arbitration agreements. The statute's evident purpose is to facilitate, not to hinder, private arbitration. Requiring a party to employ a legislatively prescribed remedy simply cannot be deemed contrary to the "normal expectations of arbitration participants." (Maj. opn., *ante*, at p. 979.) In fact, the arbitration provision at issue in the present case specifically alerts the signatories that "[w]ith respect to any matter not herein expressly provided for, the arbitration shall be governed by California Code of Civil Procedure provisions relating to arbitration."

The inclusiveness of the language of section 1281.6 belies the notion that it contains some sort of ill-defined exception for unreasonable or bad faith delay. (See maj. opn., *ante*, at pp. 980-981, 984.) By its own terms, the statute comes into play whenever "the agreed method [of appointing an arbitrator] fails or *for any reason* cannot be followed." (§ 1281.6, italics added.) If there were any doubt that the statutory remedy was intended to apply broadly, the Legislature has now put it to rest. Largely in response to this very case, the Legislature recently enacted Health and Safety Code section 1373.20, subdivision (a)(2), providing that for nonindependent arbitration systems such as Kaiser's "[i]n cases or disputes in which the parties have agreed to use a tripartite arbitration panel consisting of two party arbitrators and one neutral arbitrator, and the party arbitrators are unable to agree on the designation of a neutral arbitrator within 30 days after service of a written demand requesting the designation, it shall be conclusively presumed that the agreed method of selection has failed and the method

provided in Section 1281.6 of the Code of Civil Procedure may be utilized." The new legislation also provides for attorney fees and costs against a party that "has engaged in dilatory conduct intended to cause delay in proceeding under the arbitration agreement." (Health & Saf. Code, § 1373.20, subd. (b).)

In this case, having previously submitted their dispute to private arbitration and having already completed the arbitrator selection process, the Engallas should have sought relief for Kaiser's dilatory conduct in the pending arbitration. For example, the Engallas could have presented their fraud and waiver claims directly to the arbitrators and requested that they not enforce the arbitration provision. (See *ATSA of California, Inc.* v. *Continental Ins. Co.* (9th Cir. 1983) 702 F.2d 172, 175 [waiver claim]; *Local 81, Am. Fed. of Tech. Eng.* v. *Western Elec. Co., Inc.* (7th Cir. 1974) 508 F.2d 106, 109 [same]; cf. *Rosenthal* v. *Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 431-433 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (conc. opn. of Kennard, J.) [fraudulent inducement claim as to the contract as a whole].) Likewise, the Engallas could have requested that the arbitrators sanction Kaiser's dilatory conduct by deeming Mrs. Engalla's separate loss of consortium claim to have survived her husband's death. (See *Advanced Micro Devices, Inc.* v. *Intel Corp.* (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] [describing broad remedial powers of arbitrators].) In fact, at oral argument, the Engallas' counsel conceded that this case could likely have remained in private arbitration if Mrs. Engalla's economic loss had been ameliorated.

The one thing the Engallas should not be permitted to do, however, is to circumvent the arbitrators altogether. The consequences of validating a party's unilateral withdrawal from a pending arbitration will be dramatic. Jurisdictional disputes will inevitably arise. Suppose, for example, that following the Engallas' unilateral withdrawal, Kaiser had elected to continue to pursue the pending arbitration and that the arbitrators had ultimately entered a default judgment in favor of Kaiser. Would that default judgment have been valid? Would the same have been true if the trial court had simultaneously entered a default judgment in favor of the Engallas in the pending litigation?

In addition, as the Engallas' counsel acknowledged at oral argument, if this court validates the Engallas' unilateral withdrawal, other parties to pending arbitrations will doubtlessly engage in the same conduct. Counsel's answer to this dilemma was that this court should "trust the trial courts." The majority's answer is to "emphasize . . . that the delay must be substantial, unreasonable, and in spite of the claimant's own reasonable diligence" and

not "the result of reasonable and good faith disagreements between the parties." (Maj. opn., *ante*, at p. 984; see also *id.* at pp. 979-980.)

Neither answer is satisfactory. Under the majority's holding, which has all the precision of a "SCUD" missile, the resolution of fraudulent inducement and waiver claims will necessarily entail fact-intensive, case-by-case determinations.[5] (See maj. opn., *ante*, at pp. 979-981, 982-984.) The disruptive, time-consuming nature of these determinations is well illustrated by the facts of the present case, in which "[t]he Engallas ultimately had five months to complete discovery [on the petition to compel arbitration], during which time thirteen motions were filed and more than a dozen depositions were taken." (*Id.* at p. 970.) Even assuming that the trial courts ultimately resolve all future claims correctly, the interim disruption to pending arbitrations will be simply intolerable.

## IV. Conclusion

"Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." (*Northern Securities Co.* v. *United States* (1904) 193 U.S. 197, 400-401 [24 S.Ct. 436, 468, 48 L.Ed. 679] (dis. opn. of Holmes, J.).) Although legislators, practitioners, and courts have all expressed concern that disparities in bargaining power may affect the procedural fairness of consumer arbitration agreements, this case amply demonstrates why any solutions should come from the Legislature, whose ability to craft precise exceptions is far superior to that of this court.

However well-intentioned the majority and however deserving its intended target, today's holding pokes a hole in the barrier separating private arbitrations and the courts. Unfortunately, like any such breach, this hole will eventually cause the dam to burst. Ironically, the tool the majority uses to puncture its hole is the observation that " ' "those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts." ' [Citation.]" (Maj. opn., *ante*, at p. 979; see

---

[5]The majority's decision to validate the Engallas' waiver claim promises to be particularly pernicious because the success of such a claim does not depend on any up-front, precontractual misrepresentations but solely on a party's performance during the course of a pending arbitration.

also *id.* at p. 981.) Because I suspect that parties to private arbitrations will be having quite a bit more contact with the courts than they ever bargained for, I dissent.

On July 30, 1997, the opinion was modified to read as printed above.