In re Karen Virginia STANTON,
Debtor.

T.O. KING, Appellant and
Cross-Appellee,

v.

Karen V. STANTON, et al., Appellees
and Cross-Appellants.

BAP No. CC–82–1183VPAb.
Bankruptcy No. LA–80–12450–RO.
Adv. No. LA–80–3810 (CA–13).

United States Bankruptcy Appellate Panels
for the Ninth Circuit.

Argued March 22, 1984.
Decided April 30, 1984.

748

Hugh J. Haferkamp, Santa Barbara, Cal., for appellant and cross-appellee.

John S. Poucher, Hollister & Brace, Santa Barbara, Cal., for appellees and cross-appellants.

Before VOLINN, PYLE and ABRAHAMS, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

Dr. T.O. King commenced an action against the debtor, Ms. Stanton, for dissolution of a partnership, an accounting, and a declaration that he was sole owner of the partnership assets. Ms. Stanton asked for the same relief and for a declaration that they held equal shares in the partnership assets. She also cross-claimed for damages. We affirm the trial court's judgment as to the accounting and dissolution awarding Ms. Stanton a 42.28% interest in the partnership and 57.72% to Dr. King. We reverse and remand on Ms. Stanton's cross-appeal for further proceedings on the cross-complaint for damages against Dr. King.

## FACTS

The parties entered a written partnership agreement on June 30, 1977, for the purpose of buying real estate in Montecito, California, known as the Tara property. It consisted of a large main house and several cottages on five acres of land. Before the parties became partners, Ms. Stanton had leased Tara for six months with an option to buy. The monthly rental payments of $3,000 were to be applied on the purchase price of $350,000. She gave notice of exercise of the option in April, 1977.

The partnership agreement gave each party a 50% share in the Tara property. Ms. Stanton contributed the credit of $18,000 from her past rent, plus the option to buy. Dr. King contributed $43,000 cash toward the purchase price for his 50%. The agreement provided that Ms. Stanton would make all payments on debt service, totaling $1,966.78 per month, plus real property taxes, insurance, and maintenance. If she failed to make a payment by a specified deadline, Dr. King had the right to pay. For each $1,000 he paid, he would receive an additional 1.4% of the total partnership interest. The agreement gave Stanton a right of redemption, within specified time periods, running from the date of payment by Dr. King.[1]

The agreement recited that Tara was an appreciating asset and that it was the purpose of the partnership to sell Tara if a buyer—including Stanton—offered a sum

---

1. Section 2.06 of the agreement provided that if King "purchased" an additional share by making such a payment, Stanton would have the right within 90 days of that payment to redeem that interest. If she redeemed it within 30 days of King's payment, the agreement required her to pay $1,100 for a share which cost King $1,000. If she redeemed within 60 days, she was required to pay $1,300. And if she redeemed within 90 days, the agreement required her to pay $1,500.

which netted Dr. King at least $1,000 for each 1% of the partnership which he owned.

In August 1977, Dr. King asked Ms. Stanton whether she had made the payments on the first and second deeds of trust. She said she would do so, but would be late. Dr. King offered to pay instead, and she accepted. This payment was agreed to in writing. At his request, she wrote a note stating that she was unable to make the payments that month.

Thereafter, Dr. King made all the monthly debt service payments without communicating to Ms. Stanton the fact of such payments or the dates thereof. He kept a record, unknown to her, whereby, as each payment was made he added to his capital interest 1.4% per $1,000 and subtracted that amount from hers. Some nine months later, in a letter dated May 27, 1978, he advised Stanton that he owned 100% of Tara and demanded that she immediately surrender possession and title. She denied that he was the sole owner and refused to vacate.

## LITIGATION

Dr. King filed a complaint in the Superior Court for the County of Santa Barbara, California on December 13, 1978, requesting a dissolution of the partnership and an accounting declaring that he owned Tara 100%. Ms. Stanton filed a cross-complaint charging him with fraud and breach of the partnership agreement, and also requesting a dissolution.

The complaint was removed to Bankruptcy Court after Stanton filed a Chapter 13 petition in bankruptcy on November 28, 1980. Trial was held and a memorandum of decision thereafter entered on January 26, 1982. Judgment thereon was entered on March 15, 1982, holding that Dr. King was entitled to a 57.72% interest in the partnership property, while Ms. Stanton was entitled to a 42.28% interest. The court allocated to Dr. King an additional share of 7.72% because of Ms. Stanton's written agreement, whereby Dr. King advanced $3,000 before the close of escrow

and $2,516.78 in August 1977 on the deed of trust.

The judgment ordered the Chapter 13 trustee to sell Tara. It further ordered that, after expenses of sale, the parties were to be reimbursed for their expenses as contributions to the partnership. Ms. Stanton was to be paid $37,700 for her improvements to Tara. Dr. King was to be paid $193,631 for his payments. In addition, he was to be reimbursed for payments made after December 31, 1981 on the first deed of trust. The balance of sale proceeds was to be divided in accordance with the parties' shares of ownership: 57.72% to Dr. King and 42.28% to Stanton.

Dr. King timely filed his notice of appeal and Ms. Stanton timely appealed the court's dismissal of her cross-claims.

The court's findings were stated in the course of its narrative memorandum of decision. These may be summarized as follows:

1. Stanton is a singer, dancer and actress trained in drama, with no experience in real estate or business transactions. Dr. King is educated as an agricultural economist and has invested in real estate since 1954.

2. King gave most of the input for the partnership agreement and may have dominated the partnership negotiations.

3. At the time of trial the value of the property had appreciated (beyond the purchase price of $350,000) "and may exceed $1,000,000."

4. After August, King did not give the notice required by the agreement as to any advances he made. The advances were made pursuant to a subsequent modification of the agreement as to payments. There is evidence that Stanton and King agreed that Stanton's contribution would be in the form of improvements to the property.

5. According to Dr. King's account, his ownership exceeded 100%, a conceptual impossibility. Further, the result would be a forfeiture by Stanton, a result not favored in equity.

6. The partnership objective was to sell the appreciating property. Neither partner intended to develop the property for personal use.

The court concluded that there is a duty on the part of a partner to work for accomplishment of the partnership objective. In this case, the objective was the sale of the property at a profit. The court further concluded that there should have been notice to Stanton that the payments were being made on her behalf and that the redemption periods were starting to run. It also found that no such notices, except one, were given by King, and that he saw a rapidly appreciating piece of property and realized the advantage to him of making the advances.

## APPELLANT'S CONTENTIONS

Dr. King contends, on appeal, that:

1. The bankruptcy court and this Panel lack jurisdiction; this case should be remanded to state court for retrial.

2. If the Panel retains jurisdiction, the standard of review in this case requires reversal if the bankruptcy court committed simple error, because its interpretation of the partnership agreement was a matter of law.

3. The court made no finding that the parties orally modified the written partnership agreement; it erred in deciding not to enforce the written agreement.

4. The court erred in treating appellant's payments as capital contributions to be repaid without interest, rather than requiring that debtor reimburse him at the market rate of interest from the date of payments.

5. The court erred by not ordering that Dr. King be paid a management fee of $16,076, and by ruling that he was not entitled to an additional sum for manual labor on the property.

## APPELLEE'S CONTENTIONS

1. The judgment having granted equitable relief, the proper standard of review allows reversal only if the court abused its discretion.

2. The court did not abuse its discretion in refusing to hold that appellant obtained all of appellee's partnership interest, because it correctly found that equity required Dr. King to warn Ms. Stanton that she could lose her interest.

3. The bankruptcy court erred by transferring 7.72% of Ms. Stanton's interest to appellee, and by denying her cross-claim for damages based on Dr. King's refusals of offers to buy Tara.

## DISCUSSION

### 1. *Jurisdiction*

██ Dr. King contends, without merit, that the bankruptcy court and this Panel have no jurisdiction over this case, based on the decision of the United States Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon,* the Court held that Congress' grant of jurisdiction to the bankruptcy courts under the Bankruptcy Act of 1978 was unconstitutional. However, it expressly stayed its judgment until October 4, 1982, and held that its decision would apply only prospectively. The Court later extended the stay until December 24, 1982. 459 U.S. 813, 103 S.Ct. 199, 200, 74 L.Ed.2d 160 (1982). In the case before us, the bankruptcy court entered its judgment on March 15, 1982, and therefore retained jurisdiction in this case, based on the prospective application of *Marathon. In re Wallen,* 34 B.R. 785 (Bkrtcy. 9th Cir.1983), citing *In re Eastview Estates II,* 713 F.2d 443 (9th Cir.1983).

### 2. *The Finding of Oral Modification*

██ Contrary to Dr. King's contention, the bankruptcy court did make a finding that the parties orally modified the partnership agreement so that Ms. Stanton's renovations took the place of her duty to make various payments. The finding stated, "[t]here is evidence that Stanton and King agreed that Stanton's contributions would be in the form of improvements to the

property." (Appellant's Excerpts of Record, p. 108, line 22.) Our conclusion that this is a finding is supported by the court's language at the end of the memorandum, that "[t]his memorandum is intended to constitute findings and conclusions of law pursuant to Bankruptcy Rule 752."

This finding is supported by Ms. Stanton's testimony and by evidence of her behavior during the partnership. For example, she testified that:

> I indicated to him [Dr. King] rather that I felt my improvements were equal to the payment on the TD's [2] or increasing the property value more than what the payments on the TD's were. The property is going up by leaps and bounds.
>
> And at that point Mr. King said he could continue to make the payments and I said I didn't want to lose my equity in the house if he does. And he said "Don't worry about that."

(Appellant's Extracts from Court Reporter's Transcript, P. 85, 1.18–25; p. 86, 1.1.) Ms. Stanton testified further that the parties orally agreed that her renovations would take the place of her duty to make payments as provided in the written contract. The trial court believed this testimony and evidence consistent with it.

### 3. Standard of Review

#### A. Equitable Standard

The claims and counter claims basically involve dissolution of the partnership and an accounting. Such litigation is equitable in nature. *Malott v. Seymour*, 101 Cal.App.2d 245, 225 P.2d 310 (1950). The scope of review in actions involving equitable relief is limited to a determination of whether the court abused its discretion. *Matter of Whitehead*, 583 F.2d 1104 (9th Cir.1978).

#### B. "Clearly Erroneous" Standard

Insofar as the court's findings are concerned, Dr. King contends that the court merely made a legal interpretation of the written agreement, and that therefore our review should be *de novo*. He cites *In re Bubble-Up Delaware, Inc.*, 684 F.2d 1259 (9th Cir.1982) for this proposition. However, in that case, the facts were not in significant dispute. The reviewing court simply ruled on the question of whether a legal conclusion was contrary to law. In the matter before us the facts in the record were in dispute, particularly as to whether the parties reached an oral agreement. As previously indicated, the court's evaluation of the evidence presented by documents and testimony was not clearly erroneous and therefore must stand.

### 4. The Issue of Forfeiture

Dr. King argues that the court may have treated as a forfeiture the provision granting him an additional 1.4% share for each additional $1,000 paid. He contends that, rather than causing a forfeiture, the agreement merely provided for an adjustment of the partners' shares. However, the trial court expressly held that the written agreement worked a forfeiture which was not warranted, since there was an oral modification which placed the burden of payments on King. This was an ultimate finding or conclusion based on disputed evidence. It is not clearly erroneous.

Dr. King cites *Feiger v. Winchell*, 205 Cal.App.2d 123, 22 Cal.Rptr. 901 (1962) to support his assertion that he obtained full ownership of the real property. *Feiger* is distinguishable because the party seeking to enforce the agreement had issued a call for additional capital and had warned his partners that their shares would be diminished if they did not contribute, as provided in the partnership agreement.

Forfeitures are regarded with disfavor, and strict compliance with forfeiture provisions is traditionally required. *Wickahoney Sheep Company v. Sewell*, 273 F.2d 767 (9th Cir.1959); *O'Morrow v. Borad*, 27 Cal.2d 794, 167 P.2d 483 (1946). This rule has been applied even when the

---

2. Trust deeds.

contract did not require notice of forfeiture. *Stockmen's Supply Co. v. Jenne*, 72 Idaho 57, 237 P.2d 613, 617 (1951), citing *Sullivan v. Burcaw*, 35 Idaho 755, 208 P. 841, 843 (1922).

### 5. Dr. King's Claims for Management and Labor Fees

Dr. King's claims include two charges:
1. A 30% management fee of $16,076 which accrued from February 1980 to December 31, 1981; and
2. Charges totaling $13,006 for manual labor performed on the partnership property.

▇ Dr. King asserts that the judgment is in error because it does not provide for the 30% management fee and that it should be amended because the memorandum of decision does grant the fee. The court found, and the judgment explicitly stated, that King should reimburse the partnership "for payments made to himself ... *in excess of the 30% management fee he received during the term of his management...*" [Emphasis added.] The judgment was based on evidence that King had already received the management fee.

▇ The judgment also properly ordered that King reimburse the partnership $13,006 for labor charges which he admitted paying himself in addition to the management fee. (Appellee's E.R., p. 5, 1.19–22.) Paragraph 3.02 of the partnership agreement provided that "[n]o partner shall be entitled to any salary or other compensation for his services in and about the partnership business." This provision stated a general rule of partnership law that a partner is not entitled to compensation for services rendered on behalf of the partnership. California has enacted the Uniform Partnership Act, which provides that "[n]o partner is entitled to remuneration for acting in the partnership business..." Cal.Corp. Code § 15018(f). This is in keeping with the principle that in managing partnership affairs, each partner is, in effect taking care of his own interest and is merely performing his own duties as a partner. *Wind v. Herbert*, 186 Cal.App.2d 276, 8

Cal.Rptr. 817 (1960). This principle might have raised an issue as to whether Dr. King was entitled to a management fee at all, but this issue was apparently not presented at the trial level nor on appeal.

### 6. Dr. King's Fiduciary Duty

▇ It is well established that "the relationship between partners is of a fiduciary character which imposes upon the parties the duty of good faith and fair dealing and requires that none of the partners may be permitted to take any unfair advantage." *Wind v. Herbert, supra*, 186 Cal. App.2d at 284, 8 Cal.Rptr. 817 (1960) [citation omitted]. Dr. King violated his fiduciary duty to Ms. Stanton by failing to notify her that her share was in jeopardy. This breach of fiduciary duty was especially grave because Dr. King was experienced in business and his partner was a newcomer to the field. In the conduct of a partnership, every partner is bound to act in the highest good faith toward all partners, and may not obtain any advantage by the slightest misrepresentation, concealment, or adverse pressure. *Llewelyn v. Levi*, 157 Cal. 31, 106 P. 219 (1909), citing *Cal.Civ. Code* §§ 2410, 2411. *See also, Vai v. Bank of America National Trust and Savings Association*, 56 Cal.2d 329, 15 Cal.Rptr. 71, 364 P.2d 247 (1961); *Eriksson v. Wise*, 56 Cal.App.2d 574, 132 P.2d 905 (1943); *Nelson v. Abraham*, 29 Cal.2d 745, 177 P.2d 931 (1947).

### 7. The Distribution of Proceeds

▇ Dr. King argues that if this Panel affirms the allocation of only 57.72% of the property to him, the judgment should be modified to provide that the $193,631 returned to him is charged against all distributions to Ms. Stanton. The court correctly held that the sum was a capital contribution. The effect of charging Ms. Stanton's share with that sum would be to double his capital interest.

▇ Dr. King also contends that his advances should bear interest from the date on which Ms. Stanton would have

made them. The court found that the parties orally agreed. that Dr. King would make the payments. King would be no more entitled to charge interest than Ms. Stanton would have been. Paragraph 2.03 of the partnership agreement states that "no partner shall be entitled to interest in his contributions to the capital by the partnership". Our review of the record showed no testimony that there was an understanding otherwise. The court did not abuse its discretion in treating the payments as capital contributions.

### 8. Dr. King's Claim for Rent

■ Dr. King appeals the court's denial of his claim for rent, based on Ms. Stanton's residence in Tara. His brief places the value of rent for the period of May 21, 1977 through December 21, 1981, at $96,-000 ($3,000 per month, the rate which she paid before exercising the option to buy). However, Paragraph 2.04 of the partnership agreement provided that Ms. Stanton was entitled to possession of the property "[d]uring the term of this partnership." The agreement did not require her to pay rent, and there is no evidence in the record that the parties intended for her to pay such rent.

### THE CROSS–APPEAL

The issues here are stated in Stanton's brief at p. 43, to-wit:

"The primary issues raised by Stanton's cross-appeal are, whether the Bankruptcy Court erred by transferring 7.72% of Stanton's Partnership interest to King; failing to afford relief to Stanton for the damages caused by King's breach of the Tara Partnership Agreement by his refusal to accept reasonable offers to purchase the Tara Property; and failing to afford Stanton relief for King's breach of the partnership agreement by his refusal to accept Stanton's offer to buy his interest in the partnership."

### A. The Award of 7.72% to Dr. King

■ Ms. Stanton appeals the court's apportionment of an additional 7.72% of the partnership property to Dr. King, resulting in an allocation of 57.72% of the value to him and 42.28% to her. The court awarded the additional 7.72% share to King for advances which he made to the partnership with Stanton's knowledge and consent, as evidenced by Exhibits 17 and 18, Stanton's written agreements to the advances. The court's ruling was based on an ultimate finding which was not clearly erroneous. We therefore affirm it.

### B. Dr. King's Refusal to Sell

Ms. Stanton's cross-complaint sought damages for Dr. King's refusal to accept offers by her and by others to purchase Tara. The bankruptcy court failed to address this cause of action in its Memorandum of Decision and Judgment. The court found that the partnership's object was to sell the property (Memorandum of Decision, p. 5, 1.5–6; 19–20). This finding is based partly on Section 2.05(2) of the agreement, which provides in part that:

> In the event a buyer for the premises can be obtained on terms which shall net ... T.O. King a minimum of One Thousand Dollars for each 1% of the partnership owned by him, then the partnership real property shall be sold provided the terms of sale provide the following conditions...
>
> c. The highest responsible offer meeting the above terms shall be accepted, including any offers by either of the partners.

In Ms. Stanton's cross-complaint, she sought damages for Dr. King's refusal to accept offers by her and by others to purchase Tara.

The foregoing formula would result in a cash-out figure to Dr. King of $100,000. Dr. King testified that he received Ms. Stanton's mailgram dated March 14, 1978, offering initially that sum, $100,000 cash for his interest and requesting a wire of his acceptance within 72 hours. (Exhibit 57, Appellee's Excerpts of Clerk's Record.) He admitted at trial that Ms. Stanton had the right, when she made the offer, to buy his interest for $100,200. (Appellee's E.R.,

p. 27, 1.18–25.) He further testified that he did not respond because he did not believe that Ms. Stanton could produce the cash. He made no attempt to find out whether he was correct. (Id., p. 35, 1.14–16.) Dr. King ignored a March 21, 1978 telegram requesting his immediate written reply to the previous offer.

The record also shows that Ms. Stanton requested Dr. King's acceptance of other parties' offers to buy Tara. She alleged that he did not consider them in good faith. The evidence includes a mailgram dated June 14, 1978, from Ms. Stanton requesting his response to an offer of $475,000, and a copy of a real estate contract to buy Tara for $425,000, signed by John K. Wilder and dated August 26, 1978. Finally, there is a receipt for $25,000 toward a purchase price of $575,000, dated September 24, 1978, from Joseph M. Solomon.

Dr. King testified that the offer from Mr. Wilder was approximately $25,000 too low to bring him the net amount provided by the partnership agreement. (Appellee's E.R., p. 44, 1.13–25; p. 45, 1.1–4; p. 46, 1.11–24.) He testified that he did accept the Solomon offer, also conditioned on the agreed net. However, he placed on the acceptance a further condition that Ms. Stanton accept all responsibility for disposition of a charge filed against Dr. King and the partnership for an alleged zoning violation. (Id., p. 49, 1.2–17.)

There is substantial evidence that there may have been a bona fide offer, which if accepted, would have provided more for the partnership than some other sale. This is not as yet determinable since, on the record, liquidation of the property by the Chapter 13 trustee has not as yet been accomplished.

We therefore hold that the cross-claim for damages should have been given consideration and remand it so that, depending on the funds received from sale of the property, the Court may consider whether and to what extent Ms. Stanton is entitled to damages.

## CONCLUSION

There appears in the New Testament language which may be read as a summary of what happened here, to-wit: "For to him who has will more be given, and he will have abundance; but from him who has not, even what he has will be taken away." Matthew 13:12 (Revised Standard Version).

It is apparent that Ms. Stanton entered into a fiduciary relationship with Dr. King relying on his business accumen and superior financial resources. He took advantage of her weak financial position and lack of business experience, drawing a contract which, when attended by lack of candor and refusal to consider purchase offers, was calculated to ultimately result in his full ownership of the property. The trial court properly refused to allow him the fruits of this unconscionable conduct.