In re R. Robert WATTS, d/b/a Green Hills Park, Debtor.

Bankruptcy No. 96–56992–MM.

United States Bankruptcy Court,
N.D. California,
San Jose Division.

Jan. 3, 2000.

Charles P. Maher, Andrea J. Ingram, Rosenblum, Parish & Isaacs, San Francisco, CA.

## MEMORANDUM DECISION AND ORDER THEREON

### INTRODUCTION

R. Robert Watts' objects to the claim filed by John W. Richardson, trustee for the bankruptcy estate of Leo J. Cronin, Watts' former business partner.[1] The claim includes several debts allegedly owed by Watts to Cronin, arising during the course of a joint venture. For the reasons that follow, the Court allows the claim in the amount of $227,024.16.

---

1. During the years immediately preceding his bankruptcy and during the pendency of his bankruptcy case, Cronin suffered a series of strokes, and passed away prior to trial. His son, Larry Cronin, with power of attorney over his father's estate, assisted Richardson with the preparation related to the current proceeding.

## BACKGROUND

Prior to the filing of their respective bankruptcies, Watts and Cronin participated in various real estate ventures together over a period of more than twenty years. In 1984, they jointly acquired an interest in a parcel of real property known as Green Hills, located in Scotts Valley. Watts brought considerable real estate expertise to the venture, and Cronin lent the support of his financial statement. The Green Hills property was owned by Jennings Dodril. The three—Watts, Cronin, and Dodril—entered into a joint venture agreement ("JVA") on December 22, 1984, for the purpose of developing the property. At the time the parties entered into the JVA, Sundean Foundation held a $900,000 first deed of trust on the property.

The JVA set out several terms relevant to this proceeding. Dodril retained a 50% interest in the property, while Cronin and Watts shared the remaining 50% interest. The agreement also specified the partners' capital contributions. Dodril contributed the land, which had an agreed value of $1,350,000, disregarding liens and encumbrances, while Cronin and Watts were jointly to provide $1,350,000 through equity and debt, as a working capital fund.[2] Under the original agreement, Cronin and Watts were to contribute the $1,350,000 "into escrow within 30 days from the date" that the JVA was signed.[3] However, the parties subsequently entered into a series of written modifications, brought about by Cronin's and Watts' difficulty securing a new loan as required by the agreement. Although the modifications to the JVA were not entered into evidence during trial, there was testimony that the modifications waived the original deadline by which Watts and Cronin were to secure the initial loan.

The JVA provided that Watts and Cronin were to contribute equally until they had jointly contributed $1,350,000.[4] That requirement was met on March 10, 1992. Following satisfaction of that requirement, the agreement provided that "each party ... shall contribute such working fund capital as is necessary to carry out in the following proportions: Dodril 50%, and Cronin/Watts 50%." The JVA further contemplated that the joint venturers had a right to recover from each partner "his or its proportionate share of working fund capital."[5] The agreement also contained

2. Paragraphs 5(a)(1) & (2) of the JVA, sets the initial contributions of Dodril, Watts, and Cronin. That paragraph provides:

 a. Capital Contributions: Upon execution of this Agreement:
 (1) Dodrill will and does hereby contribute the property to the Joint Venture. Disregarding liens and encumbrances, such contribution has a total agreed value of $1,350,000.00.
 (2) Cronin/Watts will contribute $250,-000.00 cash and provide credit to the Joint Venture of up to $1,100,000 for a total of $1,350,000....

3. Paragraph 5(a)(5) states:

 The obligations of the parties under this agreement are contingent on Cronin/Watts securing the aforesaid new loan, and deposit of cash funds, totaling $1,350,000.00 into escrow within 30 days from the date is signed. This contingency shall be released by the placing of funds and loan commitment [sic] into escrow as aforesaid.

4. Paragraph 6(a) states:

 As set forth above, Cronin/Watts shall provide $1,350,000 as working fund capital to the Joint Venture. Such working fund capital shall be utilized to refinance the existing indebtedness of the property, to pay Dodril as aforesaid, and to pay the cost of development on the property, including planning and engineering fees.

5. Paragraph 6(d) provides:

 If at any time or times any of said Joint Venturers shall fail to contribute his or its proportionate share of working fund capital as hereinabove provided, and such default shall continue for a period of twenty days after a date fixed therefor in a written notice sent by registered or certified mail to such Joint Venturer, or if he or it shall otherwise default in any of his or its obligations hereunder, then any other Joint Venturer at his or its election may contribute the funds which said defaulting Joint Venturer has failed to contribute, or perform the obligation or obligations which said Joint Venturer has failed to perform,

an arbitration clause, which provided that claims arising out of or relating to the JVA be submitted to arbitration.[6]

A change in ownership interests occurred soon after execution of the JVA. In 1985, Cronin acquired 4% of Dodril's interest in the venture. Ownership interests were then: Watts 25%, Cronin 29%, Dodril 46%. Cronin acquired Dodril's remaining 46% interest in 1992, leaving the respective ownership interests at: Watts 25%, Cronin 75%. The ownership interests after 1993 are in dispute.

In 1995, Cronin and Watts fell behind on the mortgage payments, and Sundean filed a notice of default on the property. In an effort to prevent foreclosure, Watts filed a Chapter 11 petition for "Green Hills, a California partnership." However, when it was later discovered that the property was held not by the partnership, but by Cronin and Watts individually, the case was dismissed.

On October 1, 1996, Watts filed a new Chapter 11 case individually, hoping to forestall the foreclosure. However, on February 28, 1997, the Court granted relief from stay, allowing Sundean to proceed with its foreclosure. Cronin filed his Chapter 11 petition on March 4, 1997, as a last-ditch effort to avoid the foreclosure. This effort also was unsuccessful, and the Court again granted Sundean relief from stay. Sundean subsequently foreclosed on the property.

After Cronin's case converted to Chapter 7, in August 1997, Richardson filed a claim against Watts' estate for $100,000, based on information contained in both Watts' and Cronin's bankruptcy schedules. Watts objected to the claim, contending that he had overcontributed to the partnership and that those contributions more than offset any debt he owed Cronin. Richardson amended the claim in May 1998. The amended claim, for $169,000, included $90,000 owed by Watts arising from a series of six promissory notes executed throughout 1993, and $79,000 arising from an unrelated venture referenced in Cronin's financial statements.

Other than the accounting completed in preparation for this proceeding, the Green Hills partnership has not had a final winding up or dissolution In February 1999, the accountants for Watts and Richardson met to discuss the partnership contributions raised by Watts as a defense to the validity of Richardson's claim. At that session, the accountants created several spreadsheets and compared Watts' and Cronin's respective contributions. A number of items were disputed, as was the method for determining the required contributions. Following that accounting session, Richardson claimed that it was Watts who owed excess contributions to Cronin in addition to the other two debts included in the claim.

The Court now looks more extensively at the facts underlying the following three obligations claimed by Richardson and objected to by Watts:

1. $90,000 in unpaid promissory notes and $67,486.85 in accrued interest through July 31, 1999, totaling $157,486.85;

and have the right to recover from the defaulting Joint Venturer the amount of such funds so contributed, and expenses incurred in performing such defaulted obligations, together with the expenses of such recovery, with interest at the rate of fifteen percent (15%) per year from the time when such funds or expenses were contributed or incurred....

6. Paragraph 16(a) of the JVA provides:
Any controversy or claim arising out of or relating to this Agreement, or the breach

thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association in effect at the time a demand for arbitration is filed with such Association. The decision in writing of the arbitrator or arbitrators appointed by such Association shall be final and conclusive, and judgment upon the award rendered by the arbitrator or arbitrators may be entered in any Court having jurisdiction.

2. $79,000 obligation referenced in Cronin's financial statements; and

3. $136,986.81 that Cronin allegedly contributed in excess of his share of the Green Hills partnership.

## I. Obligation Arising from $90,000 Promissory Notes

Between February 17, 1993 and July 13, 1993, Watts executed a series of six promissory notes in favor of Cronin in the principal amount of $15,000 each. As of July 31, 1999, accrued interest on the notes was $67,486.85. Watts has stipulated to the authenticity of the notes and has also stipulated that the notes were never repaid.

On February 19, 1993, around the same time that the first note was executed, Watts also executed a grant deed in favor of Cronin for 14% in the Green Hills property. The deed was never recorded, but was held by Cronin.

Each promissory note states that it "is secured by a 14% ownership interest currently held by R. Robert Watts." Nonetheless, Watts testified that the notes were actually "options," and that the parties agreed that Watts could redeem the notes and buy back the 14% interest by paying Cronin the $90,000 due under the notes plus interest. Watts pointed to a transmittal memo accompanying one of the six notes which he sent to Cronin that states, "Enclosed is the June *option* note." (Emphasis added).

Several documents executed by Watts following the alleged transfer treat the 14% interest as if it were never transferred. These documents include the original partnership bankruptcy schedules, Watts' amended individual bankruptcy schedules, and a deed of trust dated February 15, 1994. All of these documents reference the parties' relative interests as 75% / 25%. (Had the documents treated the 14% interest as transferred to Cronin, the relative interests would be 89% / 11%.) Watts, however, testified that he continued to refer to his interest at 25% because

"had he sold the property, he could have redeemed the 14% interest." He admitted that in his "erroneous thinking," he believed that possession of the "option" was as good as ownership. Watts, nonetheless, acknowledges that the land is gone now, and that there is nothing to redeem.

## II. $79,000 Obligation Referenced in Cronin's Financial Statements and Schedules

Richardson's claim also includes a $79,000 account due from Watts to Cronin. This account was listed on five of Cronin's financial statements and on Cronin's bankruptcy schedules. Richardson was unable to produce any other documentation supporting the existence of the debt.

Watts testified credibly that Cronin's notations pertained to an unrelated investment in Dallas, Texas. He explained that Cronin was among a group of investors who acquired an office building in Dallas in 1979, known as the Valley View property. Valley View was managed by one of Watts' entities, the Investment Exchange Service ("I.E.S."). Watts testified that in 1984, Valley View sold and the investors carried back a note payable.

In 1994, the purchaser defaulted. On behalf of the investors, I.E.S. reclaimed the property, and resold it in August 1996. Watts testified that each of the investors received payments on their portion of the note. In January 1997, the second purchaser resold the building and paid the investors in full. Cronin received his pro rata share in the amount of $57,001 on January 15, 1997, hand delivered by Watts to Cronin's son, Larry.

## III. Excess Contributions by Cronin

Following the parties' accounting session, Watts abandoned the defense that he overcontributed to the partnership. Nevertheless, the issue of contributions remains viable because Richardson now claims that Watts owes Cronin's estate $136,986.61 for contributions that Cronin made in excess of his share.

The parties' accountings differ largely as a result of their disagreement as to their respective ownership interests and the method for determining contribution obligations. Watts' accounting bases contribution liability on ownership percentages. Richardson's accounting, on the other hand, assumes that Watts and Cronin had equal obligations to contribute until the initial contribution requirement of $1,350,000.00 was met. Following March 10, 1992, when this requirement was met, Richardson's accounting changes to an ownership interest approach.

Additionally, Watts disputes specific items included in Richardson's accounting. Those disputed items include: (1) Credit given Cronin for a contribution of $122,508.97 on March 10, 1992; and (2) credit given Cronin for contributions in the amounts of $150,000 in 1995 and $100,000 in 1996.

### A. Cronin's $122,508.97 Contribution

Richardson's accounting credits Cronin for a contribution of $122,508.97 on March 10, 1992, repayment of a loan from Pajaro Valley Bank (now First National Bank). The payment was shown on a Green Hills balance sheet and in Cronin's personal notes.

The December 31, 1991 Green Hills Joint Venture Balance Sheet lists a note payable to First National Bank in the amount of $115,901.04. Watts confirmed that the loan listed on that balance sheet was the same one listed in Richardson's accountings, and that the discrepancy in amounts represented unpaid interest on the loan.

The evidence, however, did not establish that the loan was related to the Green Hills partnership. Watts testified that, instead, the funds went directly from First National Bank (formerly Pajaro Bank) into one of Cronin's separate real estate projects, the Glenn Canyon venture. Richardson's accountant testified that he did not know where the money from the original loan went or who was obligated on the loan.

### B. Cronin Contributions of $100,000 and $150,000

Watts also challenges Richardson's accounting to the extent that it credits Cronin for a $150,000 contribution in 1995 and a $100,000 contribution in 1996. The entries were apparently derived from Watts' original accounting. That original accounting did not, however, provide any documentation for the $100,000 and $150,000 Cronin contributions, and is now repudiated by Watts. Richardson did not produce any other evidence in support of the two entries. The documentation introduced into evidence established the existence of the contribution through cashiers checks totaling $112,795.65.

## CONTENTIONS OF PARTIES

### I. Watts' Contentions

Watts contends that the six promissory notes totaling $90,000 were not normal promissory notes. He claims that the notes were part of an option agreement, in which he transferred 14% of the property through an unrecorded grant deed. Watts' view is that the parties' interests following the delivery of the grant deed were: Watts 11%, Cronin 89%.

As for the $79,000 obligation, Watts argues that the account due listed in Cronin's financial statements and bankruptcy schedules was not actually a debt, but instead represented an investment by Cronin in the Valley View property. He asserts that he was never personally obligated to Cronin for $79,000.

Watts challenges several preliminary issues with respect to the partnership contributions, including the method for calculating the required contributions, the validity of the JVA, this Court's jurisdiction over the claim for contributions, and whether the contribution issue was properly before this Court in light of the arbitration clause contained in the JVA—as

well as the amount of both parties' contributions. As for the method, Watts contends that the contributions should be determined strictly by ownership percentages. In contesting the validity of the JVA, Watts contends that the parties never contemplated that the agreement would be used in determining respective profits and losses. He claims that the JVA was simply a marketing device to buy out Dodrill and to keep Sundean from foreclosing on the property. Watts argues that the failure of the condition contained in paragraphs 5(a)(1) & (2)—to timely contribute a working capital fund—voided the agreement.

Watts challenges this Court's jurisdiction, asserting that only the two individual partners in their chapter 11 cases are before the Court—not the partnership entity. He claims that the partnership entity "needs the treatment of a dissolution, winding up, and accounting before the individual interests of the partnership can be properly put before the Court." In his opening statement at trial, Watts argued for the first time that this court lacks jurisdiction to decide the contribution issue because of the arbitration clause in the JVA. He claims that the American Arbitration Association is the proper entity to hear the contribution issue arising from the dissolution.

Finally, with respect to the specific items in Richardson's accountings, Watts claims that Cronin should not receive credit for the March 10, 1992 payoff to First National Bank because Cronin used the money for an unrelated venture. Watts also disputes the $100,000 and $150,000 contributions credited to Cronin in 1995 and 1996, and argues that there is no documentation for such contributions.

## II. Richardson's Contentions

Regarding the $90,000 promissory notes, Richardson contends that there was never a transfer of the 14% interest from Watts to Cronin. He claims instead that the parties entered into a secured transaction.

As for the $79,000 obligation, Richardson contends that the claim should be granted based on Cronin's financial statements and schedules. He asserts that there is no evidence that the debt has been repaid.

Turning to the contribution issue, Richardson contends that the JVA is valid and determines the requisite contributions. He claims that pursuant to paragraphs 5(a)(1) & (2), Cronin and Watts had an equal obligation to contribute capital until they had contributed a total of $1,350,000—regardless of the parties' ownership interests. According to Richardson, the 50% interest that Cronin acquired from Dodril was fully contributed and had no obligation for further contribution until Cronin and Watts had contributed the $1,350,000.

Richardson contends that Watts' jurisdictional and arbitration challenges are simply last minute efforts to prevent the Court from reaching the contribution issue. He claims that Watts has on numerous occasions consented to the jurisdiction of this Court and that by raising the contributions as a defense to Richardson's claims, Watts has waived any right to arbitration pursuant to the JVA.

With respect to the specific items disputed by Watts, Richardson claims that Cronin should receive credit for the $122,508.97 payment to First National Bank as evidenced by the Green Hills balance sheet and Cronin's personal notes. With respect to the 1995 and 1996 entries for $100,000 and $150,000, Richardson contends that Watts' original accountings speak for themselves.

## DISCUSSION

### I. Cronin's Estate is Entitled to $90,000 for the Promissory Notes and $67,486.85 in Accumulated Interest

The statute of frauds requires that the option agreement, as alleged by Watts, is only valid if written. See 1 Witkin, Summary of California Law, Contracts

§ 302, at 286–87 (9th ed.1987); Cal. Civil Code § 1624(a)(3) (West Supp.1999); *see also Woods v. Bradford,* 254 Cal.App.2d 501, 62 Cal.Rptr. 391, 392 (1967) (concluding that an option to purchase real property falls within the statute of frauds and must be in writing). The only writing that exists in this case is a transmittal memo from Watts to Cronin, and the deed itself. Neither satisfies the requirements of the statute of frauds. *See* Restatement (Second) of Contracts § 131 (1979) (Writing must "indicate that a contract ... has been made by the parties" and "state[ ] with reasonable certainty the essential terms...."). The grant deed on its face provides no evidence of any such agreement; and while the transmittal memo makes simple reference to one of the notes as the "June option note," it specifies none of the terms of the alleged agreement.

Moreover, there is insufficient evidence that Watts intended to transfer title to 14% of the property. While it is true that Cronin had possession of the grant deed, the evidence rebuts any presumption of delivery in this case. *See Pieper Vuckan v. McCormick,* 224 Cal.App.2d 670, 37 Cal. Rptr. 46, 57 (1964) (Presumption of delivery where deed is found in possession of grantee is rebuttable in the face of contrary evidence.); *see also* 4 Witkin, Summary of California Law, Real Property § 170, at 379. Watts repeatedly held himself out as the owner of a 25% interest on many occasions following the alleged transfer. He executed several documents under oath, including his bankruptcy schedules, which treated the 14% interest as his. Because the evidence shows that Watts did not intend that the grant deed irrevocably pass title to Cronin, delivery was ineffective. *See* 4 Witkin, Summary of California Law, Real Property § 170, at 380 (Delivery requires the grantor's intent that title pass irrevocably.).

Since there was no transfer of Watts' interest, the Court finds that from March 10, 1992—the date when Cronin acquired Dodril's remaining interest in the venture—until the bankruptcy filings, the parties' respective interests were Cronin 75 %, Watts 25%.

For the reasons stated above, the Court allows that portion of the claim pertaining to the $90,000 promissory notes. The Court further finds interest is due in the amount of $67,486.85 as of July 31, 1999.

## II. Richardson has not Produced Sufficient Evidence that Cronin's Estate is Entitled to $79,000 Obligation Listed on Cronin's Financial Statements

■ The Court is not persuaded that Watts owed Cronin $79,000 as claimed on Cronin's financial statements. Watts has presented sufficient evidence to defeat the prima facie validity of Richardson's claim. Watts' testimony calls into doubt the existence of a debt; Richardson did not produce any evidence other than Cronin's handwritten notations, and was unable to rebut Watts' testimony that the notations represented an investment rather than a debt. The Court disallows that portion of the claim related to the $79,000 explained as the Valley View investment.

## III. Cronin's Estate is Entitled to $62,486.85 in Excess Contributions

### A. This Court Has Jurisdiction over the Claim for Excess Contributions

■ Richardson's claim for excess contributions is within the jurisdiction of this Court. A bankruptcy court has jurisdiction to hear claims and counterclaims involving dissolution and accounting of the partnership. *See King v. Stanton (In re Stanton),* 38 B.R. 746, 750–51 (9th Cir. BAP 1984); *see also Schlein v. Golub (In re Schlein),* 178 B.R. 82, 84–85 (Bankr. E.D.Pa.1995) (Appointment of receiver for purpose of winding up affairs of partnership and relationships of partners was within court's jurisdiction over individual partner's chapter 11 case).

 The lack of a final dissolution or winding up does not deprive the Court of jurisdiction in this case. Richardson's claim is valid under California law. *See Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 741 (9th Cir.1985) (validity of a bankruptcy claim in litigation under § 502(b) is determined under state law). While a partner ordinarily must enforce his rights against other partners through an equitable suit for dissolution and accounting and generally may not bring an action at law for money until that accounting has occurred, there are exceptions to the rule. *See* 9 Witkin, Summary of California Law, Partnership § 35, at 431 (9th ed.1989); *Security Pacific Natl. Bank v. Lyons,* 25 Cal.App.4th 706, 30 Cal.Rptr.2d 623, 625–26 (1994); *see also* Cal.Corp.Code § 15037 (West 1991). Moreover, most of the cases considering the general rule have not applied it because of various exceptions. *See Security Pacific,* 30 Cal. Rptr.2d at 626. One of those exceptions is when the action is one for contribution after the partnership has already dissolved. *See Malott v. Seymour,* 101 Cal. App.2d 245, 225 P.2d 310, 311 (1950); *see also Liebersohn v. Ali (In re Fineberg),* 202 B.R. 206, 223 (Bankr.E.D.Pa.1996) (interpreting partner's right to an accounting under California Corporation Code). This proceeding represents that very exception.

### B. Watts Waived His Right to Arbitration under the JVA

 The right to compel arbitration may be waived. *See Christensen v. Dewor Developments,* 33 Cal.3d 778, 191 Cal.Rptr. 8, 661 P.2d 1088, 1090–91 (1983); *Engalla v. Permanente Medical Group,* 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 938 P.2d 903, 923 (1997); *Sobremonte v. Bank of America,* 61 Cal.App.4th 980, 72 Cal.Rptr.2d 43, 50 (1998). However, because "arbitration is strongly favored," courts must "closely scrutinize any claims of waiver." *See Sobremonte,* 72 Cal.Rptr.2d at 50. There is no single test for establishing waiver. *See id.* "California courts have found a waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration to instances in which the petitioning party has unreasonably delayed in undertaking the procedure." *Engalla,* 64 Cal.Rptr.2d 843, 938 P.2d at 923. Among the factors a court can consider in determining waiver are:

(1) Whether the party's actions are inconsistent with the right to arbitrate;

(2) Whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate;

(3) Whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay;

. . . .

(4) Whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and

(5) Whether the delay 'affected, misled, or prejudiced' the opposing party.

*Sobremonte,* 72 Cal.Rptr.2d at 50 (citations omitted).

 Applying these factors, Watts waived his right to arbitration by failing timely to assert the right and by taking steps inconsistent with an intent to invoke arbitration. The Court further finds that prejudice has resulted from Watts' delay.

The JVA provided no deadline in which Watts was required to assert his right to arbitrate. "When an arbitration agreement does not specify the time in which arbitration must be demanded, a reasonable time is allowed. . . . What constitutes a reasonable time . . . depend[s] on the situation of the parties, the nature of the transaction, and the facts of the particular case." *Sobremonte,* 72 Cal.Rptr.2d at 51 (citation omitted). Here, the twenty-one months Watts waited from the time at

which he first raised the contribution issue—in his objection to Richardson's claim, on November 7, 1997—until he first raised his right to arbitration—in opening arguments to the Court on the first day of trial on August 2, 1999—was unreasonable.

Watts was on notice, even raising the issue himself, that the contribution issue was before the Court as early as November 1997. He had the opportunity to raise the issue on numerous occasions, yet did nothing to bring about arbitration until the day of trial. "If a party wishes to compel arbitration, he must take active and decided steps to secure that right. . . ." *See id.* Watts' failure to raise the issue earlier constituted an unreasonable delay amounting to waiver.

Moreover, Watts' conduct prior to raising the issue at trial was inconsistent with an intent to arbitrate. In the twenty-one months prior to trial, Watts continued to prepare for trial. Both Watts and Richardson conducted fairly extensive discovery into the contribution issue. Their accountants prepared several spreadsheets and participated in work sessions together. Watts' February 1, 1998 motion to dismiss his petition never mentioned the right to arbitration. Furthermore, the issue was never raised in Watts' prehearing conference statement or trial brief, nor was it raised in the parties' joint pretrial conference order.

Prejudice to the opposing party is necessary for a finding of waiver. *See Christensen,* 191 Cal.Rptr. 8, 661 P.2d at 1091. In determining whether a party has been prejudiced, the Court may consider "the length of the delay in demanding arbitration and the expense incurred by that party from participating in the litigation process." *See Sobremonte,* 72 Cal.Rptr.2d at 52. In this case, Richardson was prejudiced by Watts' delay. As a result of the delay, the parties spent twenty-one months revising the claim and preparing for trial. Richardson participated in numerous hearings and status conferences. The parties employed three accountants who prepared

various documentation and participated in work sessions. Richardson employed an expert who testified at trial on the contribution issue.

■ Arbitration is meant to be "an expedient, efficient and cost-effective method" for resolving disputes. *See id.* at 53. Given the time and money that has already been spent in conducting a trial on the contribution issue, many of the benefits of arbitration have already been lost. For these reasons, the Court finds that Watts has waived his right to arbitrate.

## C. JVA is Valid and Provides the Method for Determining Contributions

■ The evidence shows that the parties intended the JVA to be the operative agreement, even taking steps to modify the agreement in writing. Watts, himself, stipulated that the JVA was the "governing document" for the Green Hills partnership.

The agreement remained valid even though the parties failed to secure the initial loan by the original deadline and despite the subsequent changes in ownership. Neither event terminated the JVA, as alleged by Watts. First, the parties modified the original deadline in writing, extending the time and manner in which Watts and Cronin were to secure the loan. Moreover, there was evidence that despite the occurrence of these two events—the passage of the original deadline and Cronin's acquisition of Dodril's interest—the parties continued to treat the JVA as operative, even entering into future written modifications.

Having concluded that the JVA is valid, the Court now turns to the method for calculating required contributions. Paragraphs 5(a)(2) and 6(a) of the JVA provide the initial contribution requirements. *See Goldstein v. Burstein,* 185 Cal.App.2d 725, 8 Cal.Rptr. 574, 576 (1960) (Where the parties have an agreement, the obligation to contribute capital is pursuant to that

834

agreement.); *see also* Cal.Corp.Code § 15018 (West 1991). Under these provisions, Watts and Cronin were required to contribute equally (50%–50%) until they had jointly contributed the initial $1,350,-000—regardless of the fact that Cronin had begun acquiring Dodril's interest. Cronin's acquisition of Dodril's interest did not alter the initial contributions required by the JVA. Dodril's interest was fully contributed at the point that Dodril contributed the land—whether it was owned by Cronin or Dodril. The transfer of that interest to Cronin did not change the fact that that portion of the partnership interest had satisfied its initial contribution requirements. Thus, ownership interests were irrelevant prior to the time that the initial contribution requirement was satisfied on March 10, 1992.

It was the intent of the parties, as evidenced by paragraph 6(d) of the JVA, that contributions then be commensurate with ownership. As of March 10, 1992, Cronin became responsible for 75% of the contributions. Watts likewise was responsible for capital contributions commensurate to his 25% ownership interest.

Accordingly, the Court accepts Richardson's August 17, 1999 supplemental accountings as accurate. Richardson's accounting utilizes both the proper method for determining contributions and the correct ownership percentages.

■ With respect to the specific accounting disputes, the Court finds in Watts' favor on both. Richardson has not shown by a preponderance of the evidence that Cronin should be given credit for the contested contributions. Regarding the 1995 and 1996 contributions, Cronin's estate should receive credit only for the provable contribution in the amount of $112,795.65. The cashier's checks produced by Watts were the most persuasive evidence documenting the contributions. Richardson's accountant's testimony that he relied on Watts's accountings for the

$100,000 and $150,000 contributions is not sufficient, especially where Watts later repudiated his own accountings.

■ Nor has Richardson met his burden of proof with respect to the First National Bank payment. Even though the balance sheet listed the loan as a Green Hills obligation, the Court is persuaded by Watts' testimony otherwise. Richardson was unable to produce any evidence rebutting Watts' testimony and verifying that the money was in fact used for the Green Hills partnership. Because Richardson has not satisfied his burden of proof on either item, Cronin's estate will not receive credit for the $122,508.97 First National Bank payment, and will receive credit in 1995 and 1996 only for the amount of $112,795.65.

■ Cronin contributed $1,167,985.92 to Green Hills, and Watts contributed $743,250.67. Cronin contributed $69,-537.31 in excess of that required by the JVA. The Court allows that portion of Richardson's claim in the amount of $69,-537.31 *See AB Group v. Wertin,* 59 Cal. App.4th 1022, 69 Cal.Rptr.2d 652, 663 (1997) (A partner is entitled to repayment of capital in excess of his or her share); *see also* Cal.Corp.Code § 15040(f) (West 1991).

## CONCLUSION

For the reasons stated above, Richardson's claim is granted in the amount of $227,024.16. This amount includes the $90,000 in promissory notes, plus $67,-486.85 in interest through July 1999, and excess contributions in the amount of $69,-537.31. To the extent that the Court may have erred in its calculations, counsel is directed to prepare and submit alternative accountings, based on the findings made in this decision.[7]

---

7. Richardson's August 17, 1999 supplemental

accounting provided alternative accountings

based on various adjustments related to the items disputed at trial. That accounting, however, did not provide for the current alternative in which (1) Watts is not given credit for a $10,084.68 contribution on February 29, 1990; (2) Cronin's contributions of $150,000 in 1995 and $100,000 in 1996 are replaced with uncontested contributions of $112,-795.65; and (3) Cronin's contribution of $122,508.97 on March 10, 1992 is removed. The Court utilized Exhibit F attached to Richardson's August 1997 supplemental accountings, removing credit given to Watts for the February 29, 1990 contribution, in making the adjustments to final contribution data.